[Civ. No. 13664.   First Dist., Div. One.   Apr. 15, 1948.]

JESSE B. CAMERON, Appellant, v. LOUISE A. CAMERON, Respondent.

Anthony S. Devoto for Appellant.

Henry Jacobsen, Jr., for Respondent.

BRAY, J.—Plaintiff husband commenced an action for divorce on the ground of extreme cruelty. Defendant wife cross-complained for separate maintenance. After trial, the court denied the husband a divorce, granted defendant a decree of separate maintenance, awarded her the sum of $125 per month for support until the further order of the court, and awarded her attorney fees in the sum of $250. The plaintiff appeals.

No attack is made on the action of the court in denying plaintiff a divorce, or in granting defendant a decree of separate maintenance. It is contended, however, that the court erred in allowing the sum of $125 per month as support and in allowing attorney's fees, and also in failing to approve the property settlement agreement entered into between the parties.

The parties were married in 1914, and lived together until their separation on February 10, 1942. On March 13, 1946 (about ten months prior to the filing of suit) they entered into an agreement denominated "Property Settlement Agreement." In his complaint plaintiff alleged that the rights of the parties in the community property were adjusted in this agreement. Defendant, in her answer, denied this allegation, and in her cross-complaint alleged that there was community

property in the possession of plaintiff, the exact nature of which was known to him but not to her, and asked permission to amend to include a description of it when ascertained. It asked that the court inquire into the community property and award all of it to defendant, because of plaintiff's extreme cruelty.

Neither in the decree nor in the findings is there any mention that there is or is not any community property, nor does the court attempt to dispose of any community property. There is no mention of the agreement in the decree, and the only mention of it in the findings is in the following language: "That although the plaintiff and cross-defendant and defendant and cross-complainant *purported* to enter into a written agreement disposing of their community property rights and the duty of the plaintiff and cross-defendant to support and maintain the defendant and cross-complainant, the court disapproves the said agreement insofar as the same purports to limit the obligation of the plaintiff and cross-defendant to support and maintain the defendant and cross-complainant to the sum of Seventy-five Dollars ($75) per month on the ground that the court finds that the said sum of Seventy-five Dollars per month ($75) for said purposes is both unfair and inadequate for said purposes; . . ." (Emphasis added.)

Appellant contends that respondent received the entire community property and agreed in consideration thereof to accept the sum of $75 per month support, and hence, that the court had no power to increase the amount to be paid; that this was the type of agreement which in *Adams* v. *Adams,* 29 Cal. 2d 621 [177 P.2d 265], was held must either be approved or disapproved in whole and not in part.

In that case, the court held that there are generally three categories into which fall agreements entered into by husband and wife, upon separation, for support and maintenance: (1) " . . . contracts in which the support and maintenance provisions are in the nature of alimony, whether in lump sum or monthly payments, and are separable from the provisions that divide the property. The contract may even provide solely for support and maintenance with reference to a division of property." (P. 624.) (2) " . . . contracts in which the 'support and maintenance' provisions are not in the nature of alimony but are part of the division of property. This category also includes contracts that provide solely for the payment of monthly or lump sums 'in lieu of community

property.' '' (P. 625.) (3) " . . . contracts in which the wife waives all support and maintenance, or all support and maintenance except as provided in the agreement, in consideration of receiving a more favorable division of the community property.'' As to contracts in the first and second class, the court has the power to modify the provisions for alimony; but as to those in the third class, the court cannot change the alimony provisions, but must either approve or reject the contract as a whole.

It is often difficult to determine into just which category a particular contract falls. As said in the Adams case (p. 625), in holding that the trial court when it renders a decree should determine which type of contract the one in question is: " 'The court could examine the agreement, the circumstances under which it was made, and the nature and value of the property as related to its division and the amount of the periodic payments giving consideration to the statutory rules on the subject.' ''

The agreement in question here differs from the one in the Adams case, in that in the latter it states that the wife expressly waives any right to support and maintenance other than, or in addition to, support for 18 months ''in view of her skill and training as an experienced secretary, and by reason of her ability to become gainfully employed . . . and in consideration of [the husband's] agreement to transfer and assign to [her] the major portion of the community property as hereinabove set forth.'' (P. 622.) In the agreement in question here, it does not set forth the community property or the claim that the wife is receiving a major portion of that property. Moreover, the allowance in the agreement is not a sum certain but one to continue until the remarriage of the wife and also is the exact sum which the husband had been paying her from January 7, 1943, to the time of the execution of the agreement.

The preamble of the agreement sets forth: ". . . it is the mutual wish and desire of said parties that a full and final adjustment of all their property rights, interests and claims be had, settled and determined . . .'' The agreement does not state what community property the parties have, the sole reference to any real or personal property being the statement that the wife is to receive the real property at 55 Rosewood Drive, San Francisco (actually, it was only the equity therein), and all the household furniture and personal prop-

erty therein, save articles of "personal value to the husband."
It provides a waiver of each party against any and all prop-
erty that either might thereafter acquire, and that "The wife
does and shall accept the provisions herein made for her full
satisfaction of her right to the community property of the re-
spective parties hereto, and in full satisfaction of her right to
support and maintenance."

Interpreted in the light of the circumstances of the case,
the agreement supports the construction which the court evi-
dently gave it. According to the respondent's testimony, ap-
pellant retained an automobile worth $2,000, had money in
the bank, had told her that he was hiding money, and she be-
lieved there was more community property than that which she
received. (Apparently there was some foundation for this
belief, as he told her he was "hiding money," and she did
not know at the time that he had $1,850 with which to buy a
lot for his affinity.) Appellant testified that there was no
other community property. However, he had a collection
agency business with one of the major oil companies as a
client and also was in the real estate and business opportunity
business. The year before the execution of the agreement he
was able to buy a lot costing $1,850 for the woman who the
evidence indicates came between him and respondent. For
more than a year appellant lived with this woman, and when
she died, about three months before the agreement was signed,
he paid certain expenses of her last illness, and the cost of her
grave. He was repaid by her estate for the cost of the lot
and the moneys advanced by him. He contends that all these
expenditures were made from the receipts from the sale of
his diamond ring, presumably his separate property. Appel-
lant was evasive about the amount of income from his busi-
ness. "But there were so many entertainment items that I
spent money on in the pursuit of my business that I lost
money . . ." "Nevertheless, there are lots of women clients
I take out—I have got to take them out; it is my business."
Appellant contended that he had sold the automobile. Re-
spondent denied the claim of appellant that she signed the
agreement because she believed appellant was turning every-
thing over to her. She testified that she signed it because
appellant had promised that "if and when his circumstances
became so that he could afford to pay more, or your [respond-
ent's] circumstances readjusted themselves so you needed
more, that he would see to it that you got it." Appellant ad-

mitted this promise. This testimony does not vary the terms of the contract, but shows its true consideration.

On this appeal, we must take the facts most strongly in favor of respondent, including all reasonable inferences therefrom. Examining the agreement in the light of the circumstances, it appears that the agreement is not one in which the wife in consideration of receiving a more favorable portion of the community property bound herself to only $75 per month support. Even assuming that the property received by her constituted all of the community property, it does not follow necessarily that it was given or received on condition that she would limit her claim for support to $75 per month. The testimony shows clearly that the break-up of the marriage was due to the fact that appellant became enamored of his secretary, finally left respondent, and made his home with his affinity. Particularly in view of the condition of respondent's health, it would not have been unreasonable, had there been no property settlement, for a court to award the entire community property to respondent, as well as require a reasonable support to be paid. "The effect of the separate maintenance decree was to establish [the wife] as the innocent party and the husband as the wrongdoer. . . ." (*Cardinale* v. *Cardinale,* 8 Cal.2d 762, 767 [68 P.2d 351].) The circumstances support the inference that appellant transferred the home to respondent because of his guilt and her condition, and not because of any promise on her part to accept only $75 per month support.

The case of *Majors* v. *Majors,* 70 Cal.App.2d 619 [161 P.2d 494], cited by plaintiff, is not in point. In that case the amended complaint set up the property settlement executed by the parties and prayed that it be approved by the court. The defendant defaulted. At the trial "No suggestion was made to the court that the agreement was in any respect unreasonable or unjust to either party nor that plaintiff's consent thereto had not been given voluntarily and advisedly." (P. 623.) In spite of the fact that plaintiff was not asking for support and was asking that the agreement be approved, and offered no evidence to show that the agreement was unfair, the court disapproved the agreement and ordered defendant to pay $1.00 per month support. The appellate court very properly held that the trial court had no power, under the circumstances, to disapprove the agreement, nor in a default case to grant relief not prayed for.

While the complaint stated that the rights of the parties in the community property were settled by the agreement, it did not specifically ask that the agreement be approved. The cross-complaint asked that all community property be awarded to respondent. However, it is doubtful if the court was asked to pass on, or could have passed on, the agreement as a whole. At the time of the trial, the property had been sold, the mortgage against it paid, and respondent had realized the sum of $11,000. Apparently, after the execution of the agreement, and long before suit, appellant joined in a deed by which the property was transferred to a purchaser. Certainly, the agreement alone would not have enabled respondent to have conveyed title to the purchaser. In other words, appellant did not wait to find out if a court would approve the entire transaction, as it would have to do under appellant's theory. Appellant by his own act, in completely disposing of the property, placed it beyond the power of the court to approve the transaction as a whole. So that, in effect, the only portion of the agreement before the court for approval was that dealing with the support. The other portion of the agreement was completely executed. The court refused to approve what in effect was the only portion of the agreement presented to it. This accounts for the peculiar wording in the findings—that the "purported" agreement is disapproved "in so far as the same purports to limit" the amount of support.

### Basis of Award for Support

Appellant also contends that there is no evidence tending to show either respondent's need or appellant's ability to pay the amount awarded. The award of support, of course, is a matter in the discretion of the court and must be upheld unless there is no substantial evidence to support it, and hence, a clear abuse of discretion. (*Horton* v. *Horton*, 18 Cal.2d 579 [116 P.2d 605].) The evidence shows that while respondent has $11,000 in cash, $250 in U. S. savings bonds, and an income of $25 per month from the rental of a room, it also shows that respondent is no longer a young woman, has a heart condition which prevents her from working, is under a doctor's care, and that with doctor bills and other expenses she requires at least $150 a month to live on. It cannot be said as a matter of law that a wife whose husband abandons her for another woman after 28 years of married life, who has borne and raised two children,

who during 10 years of the marriage worked as her husband's secretary in his collection business without compensation for her services, who is ill and unable to make her own living, has no need of support from her former husband as she can use her capital of $11,000. ''The law is settled in California that when a wife is the owner of nonincome producing property she is not required to have recourse to such property for her support before seeking support from her husband. (*Farrar* v. *Farrar*, 45 Cal.App. 584, 586 [188 P. 289]; *Busch* v. *Busch*, 99 Cal.App. 198, 200 [278 P. 456].)'' (*Buehler* v. *Buehler*, 73 Cal.App.2d 472, 475 [166 P.2d 608].)

■ Nor can we say that the court was in error in finding that appellant has the ability to pay $125 per month. It is true that he claimed he was ''broke.'' However, he is engaged in two businesses whose success depends upon how much energy and effort he puts into them. While during all his testimony he contends he is not making any money, still he talks of all the money he spends on entertainment and taking women clients out, and admitted making $2,500 the previous year. An examination of his testimony raises a reasonable inference that he made more money than he admitted and justified the court in believing that he could make more money if he desired.

### Counsel Fees

■ The allowance of counsel fees, like allowance for support, is a matter within the sound discretion of the trial court. (*Heck* v. *Heck*, 63 Cal.App.2d 470 [147 P.2d 110].) ''. . . the law does not require a wife to have recourse to her own resources first, to the impairment of the capital of her own separate estate.'' (*Westphal* v. *Westpahl*, 122 Cal.App. 388, 390 [10 P.2d 122]; *Fallon* v. *Fallon*, 83 Cal.App.2d 798 [189 P.2d 766].) It cannot be said that the court in the case at bar abused its discretion in making the allowance for counsel fees.

The judgment appealed from is affirmed.

Peters, P. J., and Ward, J., concurred.