[Civ. No. 21860.   Second Dist., Div. One.   Feb. 4, 1957.]

IRWIN R. WRIGHT, Appellant, v. MARGARET WRIGHT, Respondent.

Jerome Weber and David Hoffman for Appellant.

Glenn S. Roberts for Respondent.

FOURT, J.—This is an appeal from certain parts of a judgment entered on December 9, 1955, which pertains to a property settlement agreement, and which awards the defendant and cross-complainant permanent alimony and awards attorney's fees to her counsel.

The plaintiff, cross-defendant and appellant will hereinafter be referred to as the husband, and the defendant, cross-complainant and respondent will hereinafter be referred to as the wife.

A résumé of the facts is as follows: The husband and wife were married on or about September 14, 1937, and separated about April 1, 1954. No children were born as the issue of the marriage. The husband brought an action in divorce July 15, 1954. The wife filed an affidavit for an order to show

cause in re alimony pendente lite, attorney's fees and costs on August 3, 1954, wherein she set forth, among other things, that she had no money; that she was employed at a hat check stand two or three nights per week at 75 cents per hour plus tips; that she expected to work in the future if physically able; that there were two parcels of real property and two automobiles belonging to the parties. The husband filed an answering affidavit in which he set forth, among other things, that the wife made about $80 per month; that his monthly income from all sources was about $360; that his wife formerly had tuberculosis, but was cured six years ago; that she was physically fit and able to support herself and that $75 per month was reasonably necessary for the wife's support and was within his ability to pay.

The order to show cause was heard on August 12, 1954. At that time there was introduced into evidence an affidavit of Dr. Reginald H. Smart, M.D., who specialized in diseases of the chest. The affidavit of the doctor set forth that Mrs. Wright first became ill at the age of 16 years when she had tuberculosis of the right kidney, which kidney was removed surgically; further, that in January, 1941, she was found to have tuberculosis in both lungs, and in March, 1942, was admitted to a sanatorium where she remained as a patient. Further, that in July, 1942, her right lung was collapsed by means of air refills, and in February, 1943, it was necessary to collapse the left lung by the same method. That she was continued on bilateral pneumothorax treatments in the sanatorium, and after discharge, the refills were administered in the office of the affiant, until June, 1948, when the treatments were discontinued. She had periodic checkups ever since that time. The affiant doctor diagnosed her ailment as tuberculosis of the bladder and kidney, arrested and far advanced, bilateral pulmonary tuberculosis arrested; further that he had allowed her to work part-time as a hat check girl, but that he felt that she would never be able to work full-time or engage in any occupation which entails any degree of physical, emotional or mental strain. Also, that she had had intensive treatment for 10 years before the disease was brought under control, and that any time she was subjected to undue stress or strain the disease might easily become reactivated and a relapse ensue; that it was imperative that she continue to live a sheltered life and not be expected to become self-supporting.

On August 16, 1954, the court commissioner filed his find-

ings and recommended order. The substance of the findings are that the wife suffers from tuberculosis; that the husband struck the wife on numerous occasions and the wife was in fear; that the wife needed about $100 per month in addition to her earnings for her support and maintenance and payments on the family home. The court ordered the husband to pay $100 per month to the wife for her support and maintenance, and in addition thereto, to make the monthly payment of $56.96 on the house, plus stated attorney's fees and costs.

On August 26, 1954, the husband filed a first amended complaint wherein he alleged extreme cruelty on the wife's part and that there was community property belonging to the parties consisting of a single-family residence located in North Hollywood, and an income-producing property which consisted of a four-apartment building located in Van Nuys, and two automobiles and some furniture and furnishings. The husband requested judgment for a divorce and all of the community property.

On December 10, 1954, the wife filed an answer to the first amended complaint, wherein she set forth that the community property consisted of the two automobiles mentioned by the husband, some securities and some other items, and then set forth that the two parcels of real property were not community property, but were at all times owned in joint tenancy by the parties. She denied any acts of cruelty or other wrong doing. On the same date she filed a cross-complaint wherein she alleged that the real property was owned as above set forth in the answer to the first amended complaint, and requested that all of the community property be awarded to her. She further alleged that for many years she had been treated for tuberculosis, that she was unable to work full time and to support herself and is constantly under the care of doctors; that she had no funds for support and maintenance and for costs and attorney's fees. She further claimed that the husband had physically assaulted her and that the court in this action had compelled him to remove from the residence place on or about August 21, 1954, and restrained him from harassing her.

The husband filed an answer to the cross-complaint on December 20, 1954, wherein he admitted the allegations with reference to the community property holdings, and that the real property was owned by them as joint tenants. With reference to the allegations of her health, he denied the same except-

ing that he admitted that at one time she had been treated for tuberculosis, but alleged that the condition was arrested many years ago, that she only saw a doctor for check ups not more than once a year, and further that she participated in athletics and had been employed for several years.

On February 4, 1955, an order to show cause filed by the husband for a modification of the support and maintenance allowance theretofore ordered came on to be heard. The court ordered that the order of August 12, 1954, be modified to provide that the husband pay to the wife $85 per month for her support and maintenance, and in all other respects the previous order was to remain in full force and effect.

On May 25, 1955, after considerable negotiations between the parties and their respective attorneys, a property settlement agreement was entered into. Under the agreement it was set forth that it was the desire of the parties that their community and joint property be divided and "provision made for partial support of the wife." The husband was to pay to the wife $50 per month for six months, commencing July 1, 1955, and $25 per month for six months commencing January 1, 1956, such "payments to be the only payments made by husband to wife as and for the support and maintenance" of the wife. The wife was to receive the family residence in North Hollywood, the furniture and furnishings located therein, a 1951 Pontiac automobile, one-half of the Blair Holding Company stock in the possession of the husband and one poodle dog, and in addition thereto, $2,500 in cash. The husband was to receive the income property located in Van Nuys, a 1949 Pontiac automobile, all of the furniture then in his possession and one airedale dog. Each released the other from any claims arising out of the marital relation, and each released the other from any right to support and maintenance or otherwise, and each was to pay his or her own debts, and the husband was to pay to the wife's attorney a fee of $255 in addition to the fees previously allowed.

On June 29, 1955, the wife caused a letter to be directed to the husband through his attorney, wherein it was set forth that the wife had recently been to the doctor and that he, the doctor, had informed her that a spot appeared on her lung and that she might be incapacitated. It was further set forth in the letter that the doctor advised that under the circumstances, the wife would be unable to support herself, and further that he urged that she not enter into any agreement

whereby her husband, under such circumstances, would be released of all responsibility and she become a public charge. The letter also set forth that such was not anticipated at the time of the negotiations for the settlement agreement—that the wife was satisfied with the agreement excepting as to those portions which would discharge the husband from the obligation for the support and maintenance of the wife in the event she should become physically unable to provide for herself. There then followed the statement that by reason thereof, the wife would not be bound by the agreement and did rescind the same and offered to return all things of value which she had received by virtue of the agreement. Attention was called to the fact that the case was set for trial the following month and that it would be desirable to negotiate a new agreement, taking into consideration the present circumstances as related, and that if no such new agreement could be negotiated then the matter could be submitted to the court for adjudication.

At the time of the sending of the letter above mentioned all executory provisions of the agreement had been performed except the monthly payments to be made for her support and maintenance, and as of that date the wife was able to restore everything of value received by her under the agreement.

On July 6, 1955, the husband, through his attorney, by letter, rejected the rescission and elected to stand on the agreement. In this letter it was stated that ''the basis of settlement was the valuation of the equity in the real properties as approximately equal''; it was further set forth that the wife had been gainfully employed and that there were no children and that the agreement ''was eminently fair''; that it would not ''be fair under the circumstances to surcharge Mr. Wright with her care.''

The husband did then, on November 15, 1955, file an amendment to his first amended complaint wherein he alleged and set forth that since the filing of the first amended complaint the husband and wife had entered into a full and complete property settlement agreement which provided for a division of the community property and a cash settlement and other payments in lieu of support, maintenance and alimony, *that the agreement was fair and equitable,* and *requested that the agreement be approved* and made a part of the decree, and that the parties be ordered to comply with its terms.

The wife answered the amendment by admitting that an agreement was executed and alleged that it had been rescinded. She then set forth that her physician had made a

report on her health in an affidavit form, dated August 6, 1954, which was on file; that the doctor had examined her after the execution of the agreement and that her health had degenerated; that a spot was forming on her lung and she might become permanently disabled; that such condition was not known at the time she executed the agreement, and that she had rescinded and requested the court to make an order directing the husband to pay to the wife a reasonable sum as permanent alimony, together with attorney's fees and costs and that the court approve the division of the community property as provided in the agreement, or in the alternative, the court make such disposition of the same as might be just and equitable.

At the trial no evidence was presented by the husband on his amended complaint, excepting in connection with the validity of the agreement, the circumstances under which it was drafted, the earnings and expenses of the husband, the extent and nature of the community property and the joint tenancy property, and the condition of the wife's health and her knowledge thereof. The wife testified that she had, for about a month previous to the trial, been engaged in a market, wrapping meat, and had quit because of exhaustion, suffering and a breaking down of her health; that she had been examined by the doctor a few days after the agreement was signed and the doctor said he saw a spot on one lung and that he was concerned about it, that it was a new development; that she then called the husband and told him about it, and stated that from what the doctor had told her, she wanted "the alimony get aside so that the Court could help me decide what should be done so that I could be taken care of." She also related how the husband had slapped, knocked her down and choked her, and stated that he wanted a divorce, and further that when he consumed too much liquor he became foul and vulgar and hit her.

Dr. Reginald H. Smart testified that he specialized in diseases of the chest, and testified as to the matters which were set forth in his affidavit in the order to show cause proceeding on August 12, 1954; further, that she came to him from Northern California, where she had been a patient in a sanatorium for about two and a half years. He stated that after the kidney was removed the tubercular condition developed in both lungs; that both lungs had been partially collapsed by means of air refills and that when she first came to

him, at regular intervals he would introduce air into both chest cavities to continue the collapse. He further stated that she had been under his care and treatment at periodic intervals since he first saw her. That the last examination was on November 4, 1955, and based upon the examinations he had made of her, it was his opinion that she was not able to take a full-time job without running a grave risk of reactivating her tuberculosis, which, as he stated, involved not only both lungs but involved the genitourinary system. He further said that he could not see how her condition could improve and it could get worse. He related that the damage to the lungs was permanent and as a result, among other things, their normal function of getting oxygen into the blood and carbon dioxide out of the blood had been damaged, which in turn placed a strain upon her heart. He stated that upon the last examination he found evidence of some dilatation of the right ventricle or the pumping part of the heart, which he indicated confirmed his judgment because she had been regularly employed at a market for about a month prior to the trial. As the doctor put it, ''I feel that her recent experience with working full time is evidence that is confirmatory evidence that she should not be required to work full time in a job that involves any physical exertion of any degree.'' The doctor further stated that he recalled the husband calling him some months previously when the doctor and the husband had some discussion about the physical condition of the wife, and it was the doctor's impression that the husband felt she was able to do more than the doctor thought she was able to do. The husband produced, as his witness, a Dr. Elliott A. Rouff, who also confined his practice to the diseases of the chest. Dr. Rouff stated that in his opinion she ''could do a sedentary type of work, something not requiring any physical exertion to any extent,'' and not even that type of work on a full-time basis at the start. He further stated in substance that his opinion as to her ability to work did not differ materially from the expressed opinion of Dr. Smart.

The court found that the community property consisted of household furniture and furnishings, a 1949 Pontiac automobile and a 1951 Pontiac automobile, certain Blair Holding Company stock and two dogs, and that this property had been fairly and equitably divided by the agreement. Also, it was found that the real property was owned by the parties as joint tenants, and that there was no community property interest in any such real property, and no order was made

as to its disposition. It was then found that the parties had entered into an agreement dated May 25, 1955, under which the husband was to pay the amounts heretofore set forth, and that the husband had paid to the wife all sums provided for in the agreement which accrued to the date of the trial. As to the health of the wife, the court found that she had the ailments and diseases described by the doctors and that she was unable to engage in any occupation which entailed any degree of physical, emotional or mental strain. Further, that she has no separate income and no property other than that received under the agreement. Also, that shortly after the agreement was signed, and on or about June 24, 1955, that the wife was examined by her doctor at which time she was advised that her physical condition had deteriorated and that she might be developing a heart condition; that following the examination the wife gave a notice of rescission; that the husband refused to rescind; that thereafter the husband paid the amounts specified in the agreement to the wife; that she by endorsement on each check set forth that the payments were received to apply on the court order for support and maintenance which had theretofore been made, and had not been modified, which order provided for $85 per month for the wife. The court also found that the portion of the agreement providing for the payments of $50 per month for six months, and $25 per month for a further six months and the waiver of attorney's fees was and is inequitable and unfair to the wife, and that the court should not approve such portions of the agreement; that $100 per month was found to be reasonably necessary for the support and maintenance of the wife, and that the husband had the ability to pay such an amount; that credit should be given for the sum of $2,500 paid by the husband to the wife, as well as the monthly payments made after the date of the agreement; that such credit should first apply on the obligations of the husband under the provisions of the temporary order for support and maintenance in effect at the time of trial, and the balance applied on future alimony. The court then ordered that the husband pay to the wife as alimony $50 on the first day of each month for 39 months, and commencing March 1, 1959, and the first of each month thereafter, pay the sum of $100 per month, the payments to continue until death or remarriage, or until the further order of the court. The wife's attorney was allowed an additional $150 on account of attorney's fees.

The husband contends that the court does not have the right to set aside the agreement if fairly entered into; that the court cannot disapprove parts of the agreement without setting aside all of the agreement, where it is an integrated bargain type; that the court cannot add a provision for alimony without changing basically the agreement; that there was insufficient evidence to support the rescission; that several of the findings of fact are not supported by the evidence and that Mrs. Wright is estopped by her conduct after sending the notice of rescission.

■ It is clear that the law favors the making of agreements between husband and wife if it is accomplished fairly and equitable, untainted by fraud, collusion, undue influence or the like. (Civ. Code, §§ 158, 159; *Hogarty* v. *Hogarty,* 188 Cal. 625 [206 P. 79]; *Murray* v. *Murray,* 28 Cal.App. 533 [153 P. 248]; *Anthony* v. *Anthony,* 94 Cal.App.2d 507, 512 [211 P.2d 331].) ■ As said in *Adams* v. *Adams,* 29 Cal.2d 621, at page 624 [177 P.2d 265]: "A property settlement agreement, therefore, that is not tainted by fraud or compulsion or is not in violation of the confidential relationship of the parties is valid and binding on the court." In the same case it was said (pp. 624-625): "The parties, upon separation, may agree to provide for support and maintenance in a variety of ways, which generally fall into three categories. The first includes contracts in which the support and maintenance provisions are in the nature of alimony, whether in lump sum or monthly payments, and are separable from the provisions that divide the property. The contract may even provide solely for support and maintenance without reference to a division of property. These contracts, if equitable, are enforceable even though not presented to the court in a divorce action. (*Sanborn* v. *Sanborn,* 3 Cal.App.2d 437, 442 [39 P.2d 830]. . . .) If presented to a court in an action for divorce the court has the power to modify the provisions for alimony before or, if the provisions are incorporated in the decree, after judgment in accord with its power over alimony generally. (*Hough* v. *Hough,* 26 Cal.2d 605, 613 [160 P.2d 15]. . . .)

"The second category includes, among others, contracts in which the 'support and maintenance' provisions are not in the nature of alimony but are part of the division of property. This category also includes contracts that provide solely for the payment of monthly or lump sums 'in lieu of community property.' Such contracts must be treated like other prop-

erty settlement agreements dealing solely with divisions of property. (*Ettlinger* v. *Ettlinger*, 3 Cal.2d 172, 177-178 [44 P.2d 540]. . . .) If the contract was not fraudulent when made, and there was no violation of the confidential relationship, it will be binding on the court and there can be no modification of the payments after the decree without the consent of the parties. (*Puckett* v. *Puckett*, 21 Cal.2d 833, 840 [136 P.2d 1]. . . .) The court in the divorce action may grant alimony to the wife and approve the agreement as well, since these agreements purport to deal only with the division of the property of the parties. (Civ. Code, § 139; see *Puckett* v. *Puckett, supra* at p. 841.) It is often difficult to determine, in a contract containing provisions for division of property and payments of 'support and maintenance,' whether the payments are part of the division of property or are in the nature of alimony. 'It would be better practice to have that determination clearly and concisely made by the trial court when it renders the decree of divorce. Considerable confusion and uncertainty could be avoided in that fashion. The court could examine the agreement, the circumstances under which it was made, and the nature and value of the property as related to its division and the amount of the periodic payments giving consideration to the statutory rules on the subject.' (*Hough* v. *Hough, supra* at p. 615; *Puckett* v. *Puckett, supra* at p. 841.)

"The third category includes contracts in which the wife waives all support and maintenance, or all support and maintenance except as provided in the agreement, in consideration of receiving a more favorable division of the community property. The court cannot add a provision for alimony to such contracts without changing basically the agreement of the parties as to the division of their property."

It appears to us that in the instant case there can be no doubt that the community property was divided in a substantially even manner. The court had nothing to do with dividing the real property owned and held by the parties as joint tenants. It further appears to us that the provision for support and maintenance, as it is set forth and provided in the agreement in question, is separable from the provisions having to do with the property division—in short, that the agreement in the instant case is not what is referred to as an "integrated bargain."

In the case of *Moog* v. *Moog*, 203 Cal. 406 [264 P. 490], the husband-appellant agreed to pay the wife-respondent, in

July, 1921, $50 per month as and for her support and maintenance. The husband, on occasion, paid in advance for a year at a time. The amount of alimony allowed by the court was the same as mentioned in the agreement between the parties, but the dispute arose because the judgment was entered in January, 1926, and the plaintiff had received all payments due her under the contract until March, 1927. The court found that the contract was not induced by fraud or undue influence. The husband contended that the wife had accepted the benefits of the contract for six years and she should be bound by the same, and the court could not nullify the agreement without requiring her to return the money she had received in advance payments. The court further found that the wife had, since the agreement was entered into, become totally blind and had become afflicted with tuberculosis and that she was without means. The court said in deciding the case (page 408):

"With reference to ordinary contracts, the position of appellant is sound, undoubtedly; but in actions for divorce there is a very large discretion vested in the trial court in the allowance of permanent support for the wife, where she is granted a divorce, even in the face of contracts of settlement between the parties. Such contracts must be subjected to the examination of a court in the divorce action and derive their sanction from a decree made by the court with knowledge of all the facts. (Citing cases.) The rule stated in Corpus Juris, volume 19, page 218, is to the effect that where provision has been made by the husband for the wife, by separation agreement, the wife is not entitled to temporary alimony, unless she offers to return what she has received or shows that the amount provided for in the agreement is not sufficient for her needs. The latter condition existed in the instant case."

The court then concluded the case by saying (at page 409): "It was this unfortunate condition, doubtless, which influenced the court in making the award of alimony in addition to what had already been received by plaintiff. Under the circumstances, we see no reason to interfere with the exercise of discretion vested in the trial court."

In the instant case the husband brought the agreement before the court in his amendment to his first amended complaint, and asked that it be approved. The wife set forth her reasons why it should not be approved and as a consequence, the matter became a part of the issues to be litigated. In other words, the parties asked the court to adjudicate the

fairness of the agreement under the circumstances. Had the husband so desired, he could have rested on the contract, but he elected to submit it to the court. (*Hough* v. *Hough*, 26 Cal.2d 605 [160 P.2d 15].)

The matter of the disposition of the community property was no particular problem in the case before us because each took one dog, one automobile, the furniture or furnishings in his or her possession, and an equal part of the securities. ■ There was little, if any problem about the real properties, in that each of them admitted that the properties were held and owned by them as joint tenants. The court, in any event, had no jurisdiction to award the real property to either party. (*Fox* v. *Fox*, 18 Cal.2d 645 [117 P.2d 325.) Each of the real properties was encumbered. The Van Nuys property produced sufficient income to pay the installments on the debt against it, and for many months at a time, produced monies over and above such indebtedness. The North Hollywood place produced no income. In the affidavit of the wife on the order to show cause in the first instance she set forth that the gross value of the Van Nuys apartments was $28,000, with a debt of $15,460 against it, or a net value of $12,540; that the North Hollywood residence had a gross value of $16,000, with a debt of $6,500 against it, or a net value of $9,500. The husband set forth in his answering affidavit that his net financial worth was $24,000 (community property) and made no statement concerning the real property belonging to the husband and wife. Presumably, he was satisfied with what the wife had set forth in her affidavit as to the values. In any event, he did nothing and said nothing about her statement of values.

In an affidavit for an order to show cause in re attorney's fees in March, 1956, the wife set forth that the residential property had a net value of $9,000, and the apartment house property had a net value of $12,000. The husband made no reply to that claim of valuation, as set forth by the wife. It would seem that if there was any unfavorableness in the division of the real property, it was in the husband's favor, and against the wife. ■ In any event, there is nothing from the transfer of the real properties, or from the division of the community property, that would lead us to believe that it was contemplated that the agreement was an integrated bargain. No one seems to contend that the wife got any advantage out of any transfer.

The agreement recites, following the provisions for the

support and maintenance installments which total $450, that "the aforesaid payments to be the only payments made by Husband to Wife as and for support and maintenance." The concluding sentence of the paragraph providing for what the wife was to receive is, "In addition thereto, Husband agrees to pay to Wife the sum of $2,500 cash upon the execution of this Agreement, receipt by Wife of which is hereby acknowledged."

No place is it set forth in the agreement that the money payments are to be "in consideration of the property division." We believe that the court properly proceeded to reject the agreement as to support and maintenance and grant alimony upon a reasonable basis. (*Adams* v. *Adams, supra; Puckett* v. *Puckett,* 21 Cal.2d 833 [136 P.2d 1]; *Alexander* v. *Alexander,* 88 Cal.App.2d 724 [199 P.2d 348].)

In this case the trial court had before it "the agreement, the circumstances under which it was made and the nature and value of the property as related to its division and the amount of the periodic payments giving consideration to the statutory rules on the subject." (*Adams* v. *Adams, supra.*) On the appeal, we must take the facts most favorably and strongly in favor of the respondent, including all reasonable inferences therefrom. (*Cameron* v. *Cameron,* 85 Cal.App.2d 22, 27 [192 P.2d 89].) ■ Furthermore, the award of support and maintenance to the wife is a matter of discretion of the trial court, and it must be upheld unless there is no substantial evidence to support it, or in other words, that there is a clear abuse of discretion. (*Horton* v. *Horton,* 18 Cal.2d 579, 583 [116 P.2d 605].)

In determining the matter the court was not required to consider that the wife could sell her home and thereby secure funds to live on. ■ "The law is settled in California that when the wife is the owner of a nonincome producing property she is not required to have recourse to such property for her support before seeking support from her husband." (*Buehler* v. *Buehler,* 73 Cal.App.2d 472, 475 [166 P.2d 608]. See also *Farrar* v. *Farrar,* 45 Cal.App. 584, 586 [188 P. 289].) Substantially the same thing may be said about the allowance of attorney's fees, as has been said about the support for the wife. (*Heck* v. *Heck,* 63 Cal.App.2d 470 [147 P.2d 110]; *Westphal* v. *Westphal,* 122 Cal.App. 388, 390 [10 P.2d 122]; *Fallon* v. *Fallon,* 83 Cal.App.2d 798 [189 P.2d 766].)

■ We can see nothing in the conduct of the wife which would constitute a waiver of her right to insist or stand upon

the rescission. On each check which she received from the husband she made an endorsement to the effect that such check was being received by her as part payment of the order of court and not under the contested agreement. The husband never, at any time, took any steps to make it plain on the checks or otherwise that the acceptance of such check would constitute a discharge of the provisions of the agreement. The court order in the first instance continued until modified or replaced by the decree, and the husband took no steps to modify the order at the time the agreement was executed, and in our opinion, the trial court very properly considered the delinquent amounts in giving the husband appropriate credit upon the $2,500 paid to the wife.

It is true that Finding Number 7 was not entirely supported by the evidence. The doctor, apparently, did not locate the actual heart condition until a few days before the trial in November, and not in June or July. However, the doctor did examine the wife shortly after the agreement was signed, and he did advise the wife of a new development. There is no doubt that the finding is, in the main, substantially supported by the evidence, if not literally and entirely so.

In *American Nat. Bank* v. *Donnellan*, 170 Cal. 9, 15 [148 P. 188, Ann. Cas. 1917C 744], it was said: ". . . that it is only when a judgment rests upon some particular finding for its validity and support that lack of sufficient evidence to support such finding, . . . will necessitate a reversal of the case."

It would, in our opinion, be unconscionable to hold, under the circumstances of this case, that the wife should be compelled to accept the terms of the agreement for her future support and maintenance. The trial court, quite properly from the evidence before it, held that the agreement was, as to her, unfair and inequitable.

The judgment is affirmed.

White, P. J., and Doran, J., concurred.

A petition for a rehearing was denied February 20, 1957, and appellant's petition for a hearing by the Supreme Court was denied April 5, 1957. Carter, J., Traynor, J., and Schauer, J., were of the opinion that the petition should be granted.