[Civ. No. 25433.   Second Dist., Div. One.   Mar. 16, 1962.]

ANTHONY F. SEDIA et al., Plaintiffs and Respondents, v. HARRY ELKINS, Defendant and Appellant.

David Welts for Defendant and Appellant.

Turpit, Drennen & Thompson and Roger K. Patterson for Plaintiffs and Respondents.

FOURT, J.—This is an appeal ". . . from the judgment . . . and from the whole thereof"[1] in an action for treble damages and attorney's fees based on alleged violations of the Real Property Loan Law. (Civ. Code, §§ 3081.1-3081.93.)[2]

The action was commenced on September 8, 1959, when plaintiffs filed a complaint wherein some 23 separate causes of action were set forth. Each cause of action arises out of a different loan transaction, and in some instances different parties plaintiff are involved. Each cause of action is predicated upon an alleged violation of the real property loan law relating to the regulation of real property loan brokers and the maximum legal cost, expenses, charges and interest which they may make for their services (i.e., violated the provisions of Civ. Code, §§ 3081.1, 3081.2 [failure to deliver to bor-

---

[1]The judgment provides in pertinent part as follows:

"It is ordered, a judged [sic] and decree [sic] as follows:

"(1) That ANTHONY F. SEDIA, VIRGINIA M. SEDIA, and FRANK W. OWEN recover from defendant HARRY ELKINS, $22,320.00.

"(2) That ANTHONY F. SEDIA and VIRGINIA M. SEDIA recover from defendant HARRY ELKINS, $7,020.00.

"(3) That FRANK W. OWEN recover from defendant HARRY ELKINS, $7,560.00.

"(4) That ANTHONY F. SEDIA recover from defendant HARRY ELKINS, $810.00 and

"(5) That ANTHONY F. SEDIA, VIRGINIA M. SEDIA, FRANK W. OWEN and BETTY JO OWEN recover from defendant HARRY ELKINS $1,800.00 together with costs of suit amounting to $87.20."

[2]Civ. Code, §§ 3081.1-3081.93 repealed. Stats. 1961, ch. 886, p. 2343, § 29, effective June 28, 1961. Former Civ. Code, §§ 3081.1-3081.921 now found in Bus. & Prof. Code, §§ 10240-10248, added by Stats. 1961, ch. 886, p. 2337, § 24, effective June 28, 1961.

rowers in any instance an advance written statement of information as to details of the loan] ; and Civ. Code, § 3081.3, subd. (b) 1 [charged and received a bonus, brokerage or commission in excess of that permitted]).

The answer of defendant Harry Elkins was filed October 5, 1959. In substance he alleged that he and his named lenders (who vary in the different transactions) were joint adventurers under agreement whereby the named lenders furnished the money, and he performed all of the services, not only in making the loan but in disbursing the money to the borrowers for the purchase of lots, and in acting as the builder's control agent in disbursing money for the construction of buildings, to insure that they would be completed free of liens; and whereby he agreed to purchase from his named lenders (if they so elected) their interest in the transaction on 90 days' notice. The answer further alleged that by reason of these facts defendant was a "lender" in the transactions and was not required to give the plaintiffs a written statement in advance as to the details of any loans. The answer further denies that defendant's broker commission was more than 5 per cent, and alleges that his *10 per cent fee* was not only his compensation for obtaining the loan, but also for his services as the builder's control agent in disbursing funds for the purchase of lots and construction of buildings.

Each of the 23 causes of action relates to a different loan transaction, had through an escrow, in which plaintiffs (or some of them) as borrowers obtained funds to purchase various lots and construct buildings thereon. Each loan was negotiated by defendant, a real estate broker, with different individual lenders. Defendant's fee was *10 per cent* of the amount loaned. He received his *10 per cent* fee immediately upon the closing of each loan escrow. His fee was described as a "commission" in the escrow papers.[3]

It was admitted in the pleadings that in each of the transactions defendant negotiated in the name of the named lenders to the named plaintiffs a first trust deed loan on real property, bearing interest at *7.2 per cent* per annum, payable in six months. Defendant did not in any instance deliver to plaintiff

[3]Commencing in 1959, plaintiffs had several other loan transactions with defendant, of the same kind and character as those involved in the case at bar, in which defendant's compensation was still 10 per cent, but was denominated in the escrow papers as 5 per cent broker's commission and 5 per cent builder's control fee. Plaintiffs did not sue on these transactions.

borrowers a written advance statement of information as to the details of the loans.

Prior to any of the transactions it was agreed between defendant and plaintiffs that if plaintiffs repaid a loan within four months there would be no interest (i.e., *7.2 per cent* waived) so that the total cost to plaintiffs would be *10 per cent*. As between defendant and his lenders, the latter would still get their agreed return from the transactions (i.e., defendant would pay the *1 per cent* per month interest out. of his *10 per cent* fee).

Defendant contended that a joint venture existed between himself and the named lenders; that the lenders supplied the money but defendant did everything else; that his profit would be indeterminate (i.e., any accumulated interest over and above the *1 per cent* per month would belong to defendant). While defendant in his deposition described the *1 per cent* per month his lenders got as "interest," at the time of trial he considered the amount they got as a part of the profits from the deal.

The procedure as to each transaction sued on was that plaintiffs found a piece of property and opened an escrow; the escrow company contacted defendant and informed him as to the amount of money which was needed and defendant would send an amount sufficient to purchase the lot, cover the construction loan and necessary costs and expenses; title to the property was taken in plaintiffs' names; defendant's *10 per cent* fee was paid directly out of escrow; escrow charges were paid and defendant was given a check for the balance to disburse as construction progressed.

During the progress of construction defendant visited each job site weekly and made disbursements on construction costs. Such expenditures were by checks drawn upon Security First National Bank in Los Angeles and signed "Harry Elkins as trustee." In each of the transactions plaintiffs received all money due them.

All of the loans involved in this action were refinanced by a lending institution. The refinance money went from the lending institution directly to defendant or his lenders, usually about 30 days after notice of completion was filed. In refinancing, the lending institution made a refinancing charge, usually *10 per cent,* in addition to the usual loan expense.

Defendant testified that the *10 per cent* he received out of the loan escrows was partly for a real estate commission and partly for compensation in disbursing funds and acting as

builder's control agent; that his agreements with the various lenders called for his personal guarantee that the monies would be repaid by any person making a loan; also, that he would act as a disbursing agent. He stated that the only way he could get money for transactions of the kind involved in this action was to offer the lenders something substantial and in addition give them his personal guarantee; that the matter of disbursing the money was an essential part of getting the money from his clients.

Plaintiff Sedia testified that the matter of defendant disbursing the money was discussed at their initial conversations; that he (plaintiff) knew why defendant had to disburse the money as construction progressed (i.e., protect the lenders); and that defendant's total fee would be *10 per cent*. Plaintiff Owen's testimony was substantially the same.

Defendant put all of the monies from all of the transactions involved in this action (as well as monies from other transactions) in a trustee bank account. All monies disbursed came out of this account. He had no records reflecting the comparative interest of each of the lenders in this bank account, but could determine it by going to his record sheets. Defendant also deposited his *10 per cent* fee in the same account.

Defendant had no permit from the Corporation Commissioner for the execution or delivery of any of the written agreements with his clients (i.e., the lenders). He did not file a partnership or joint venture income tax return as to money received from the transactions.

The findings of fact and conclusions of law were filed September 15, 1960. The trial court found in pertinent part as follows:

"I

"That defendant . . . did, *as a person other than a lender, for compensation payable by plaintiffs as borrowers, negotiate a total of twenty-three (23) different loans to be secured by real property. That each of said loans so negotiated was a separate and distinct transaction.*" (Emphasis added.)

"II

". . . . . . . . . . . . .

"III

"That defendant . . . did not, before any borrower involved in any of the said transaction [*sic*], became obligated

to complete any such loan, deliver a statement in writing to the borrowers, or any of them, containing the information required by *California Civil Code* § 3081.1 or § 3081.2, for [*sic*] California Administrative Code, Title 10, Article 16, § 2840, or any statement in writing whatsoever. That notwithstanding the requirements set forth in said code sections, there was no such statement either available for signature, or in fact, signed by the said borrowers or any of them, or by HARRY ELKINS or his authorized representatives; that there was no such statement on which HARRY ELKINS could or did certify that the loan was being made in compliance with Chapter 8 of Title 14, Part 4, division 3rd of the California Civil Code, that there was no copy of such statement available for [*sic*], in fact, delivered to borrowers or any of them at any time, and that there was no copy of such statement available for retention or, in fact, retained by HARRY ELKINS." (Italics shown.)

## "IV

"That as a direct and proximate result of the negotiations conducted by HARRY ELKINS, in the case of each of said transactions, the plaintiff or plaintiffs alleging each such cause entered into a contract in writing, by the terms of which each said lender or lenders agreed to loan to each said borrower or borrowers, for a period not to exceed six months, the principal amount of each said loan, to be secured by a first trust deed on the real property described, *and by the terms of which each said plaintiff or plaintiffs agreed to pay* HARRY ELKINS *as a bonus, brokerage, or commission for negotiating, procuring, arranging, or servicing such loans, and not for any other purpose, the described brokerage commission referred to above.*" (Emphasis added.)

## "V

"That each of said contracts became fully executed on the date the loan was made, and that said plaintiffs executed and delivered to said lender or lenders their promissory note in the principal amount of such loan, payable on or before six months from the date of said promissory note, secured by first deed of trust on said described real property. That defendant HARRY ELKINS did, at such time, receive from said plaintiffs as bonus, brokerage, or commission for negotiating, procuring, arranging or servicing said loan and not for any other purpose, consideration or service, the described brokerage commission.

## "VI

"That the described brokerage commission so received by HARRY ELKINS was in excess of 5% of the principal sum of the note, the said 5% being the maximum permitted by *California Civil Code* § 3081.3(b)(1)." (Italics shown.)

## "VII

"That a reasonable attorneys fee for the prosecution by plaintiffs of the action is 20% of the total judgment (exclusive of attorneys fee) for each cause of action as follows:

"  . . . . . . . . . . . .

". . . and a total reasonable attorneys fee for all causes is the sum of $6,585.00.

## "VIII

"*That prior to each transaction alleged respectively in the various causes of action set forth in plaintiffs' complaint, defendant HARRY ELKINS and the lender or lenders involved in each loan, entered into an oral agreement with respect to each such loan transaction as follows: That defendant HARRY ELKINS would secure a borrower or borrowers, and the lender or lenders would furnish the money required in the transaction; that defendant HARRY ELKINS would disburse the money to the borrowers. That in so disbursing the money, defendant HARRY ELKINS acted as the agent for, and for the account of the lender or lenders and not for the borrower or borrowers.*" (Emphasis added.)

## "IX

"*That prior to the first transaction set forth in plaintiffs' complaint, the named borrowers therein agreed with defendant HARRY ELKINS as follows: That in consideration of defendant HARRY ELKINS furnishing borrower or borrowers with lenders willing to loan money to be secured by real property the borrowers would pay to defendant HARRY ELKINS a sum equal to 10% of the monies furnished as bonus, brokerage, or commission for negotiating, procuring, arranging, or servicing each loan, and for no other purpose.*" (Emphasis added.)

## "X

"That it is not true that there was a joint adventure between any lender or lenders and defendant HARRY ELKINS or any of them.

## "XI

"That it is not true that there was a joint adventure between any lender or lenders and defendant HARRY ELKINS and any plaintiff or any of them."

Appellant's first contention is that the real property loan law has no application to the transactions involved in this action.

The Real Property Loan Law was enacted in 1955. (Stats. 1955, ch. 1791, pp. 3299-3306.) The reasons for the enactment were set forth in section 12 thereof at pages 3305-3306 as follows:

"Sec. 12. The Legislature finds the necessity for the enactment of the legislation contained in this act to be as follows: In many parts of the State, citizens of small means who are in need of borrowing money through loans secured by liens on real estate, especially, but not entirely, on deeds of trust, representing equities on their home property, are being required and induced to pay exorbitant and excessive fees and charges to persons negotiating said loans in the form of brokerage commissions and costs and expenses in great disproportion to the amount of money actually received. Such brokerage and charges are secured through the writing of loans for periods of one and two years, with final payments beyond the ability of the borrower to pay. This large final payment requires the borrower to renew or refinance the loan and thereby to pay another brokerage fee, and to incur additional costs and expenses. The total amount of the charges, costs and expenses, and interest become in the aggregate so high that such necessitous persons are faced with the loss of their security, or are finding themselves continuing in debt far beyond the normal amortization period of the loan. There is also evidence that the charges and costs and expenses are indirect means by which money-lenders may secure rates of interest beyond those authorized. Inasmuch as this legislation will require a change in the business methods of those persons affected thereby, it is desirable that the legislation become effective on the first day of a calendar month. Inasmuch as the restrictions imposed by this legislation involve a new field of lending practices it is desirable that the legislation be in effect for a stated term in order that the Legislature may review the problems involved more thoroughly before determining the provisions of permanent legislation.

"It is also desirable to make clear what transactions involving the public offering of promissory notes secured by liens

on real estate are within the jurisdiction of the Real Estate Commissioner.''

The substance of appellant's first contention is that the loan law has no application where the money borrowed is used to purchase the property. In support of this position he relies upon a statement contained in 35 Opinions Attorney General California 168, 171, as follows:

"It is not unreasonable to interpret the above quoted language [i.e., § 12] as including only the situation where the borrower of small means borrows money on his presently owned property or the equity therein, such money to be used for other purposes than the purchase of that property.''

The quoted language has substantial meaning only when read in its proper context. In the above opinion the Attorney General was considering whether the 1957 amendment to Civil Code section 3081.5, which exempted purchase money loans from the requirement that certain loans be paid off in substantially equal installments, should be available in purchase money situations where a third party lender was involved. The opinion concluded that the exemption was available.[4]

As stated in *Harris* v. *Gallant,* 183 Cal.App.2d 94, 100 [6 Cal.Rptr. 630], "It is quite clear that the Legislature intended the real estate loan statute of 1955, chapter 1791, page 3299 et seq., of which Civil Code, section 3081.5 is a part, to complement the usury statutes which implement article XX, section 22 of the Constitution. Expression of this intent is contained in the act itself (see Civ. Code, § 3081.3, subd. (c), *supra*).''

One of the purposes of the legislation was to stop the collection of excessive brokerage fees in the payment of usurious interest and to stop the perpetration of undesirable practices by loan brokers.

Appellant next contends that the evidence is insufficient to support the finding that the 10 per cent paid appellant was solely a broker's commission. The trial court found that the *10 per cent* paid to appellant was a bonus, brokerage or commission for negotiating, procuring, arranging, or servicing each loan and for no other purposes. The substance of appellant's contention is that the trial court should have made an allocation of the *10 per cent* fee—part for appellant's

---

[4]Civil Code section 3081.5 was amended and reenacted as Business and Professions Code section 10244, and, as reenacted was modified so that the exemption now applies merely to ''. . . a note given back to the seller by the purchaser on account of the purchase price.''

commission as a broker and part for services rendered as a joint control agent (*i.e.*, disbursement of funds).

In each of the 23 transactions sued on appellant's fee was described in the escrow instructions as a "commission";[5] in the disbursement of funds he was acting as agent for the *lenders*. The disbursement of funds by appellant was a condition to the securing of the loan which respondents were required to accept to obtain the money. There is substantial evidence in the record to support the trial court's determination.

The next contention is that the evidence is insufficient to support the findings against joint venture. The trial court made two findings on the issue of joint venture. One finding was that no joint venture existed ". . . between any lender or lenders and defendant HARRY ELKINS and any plaintiff or any of them." (Finding XI.) Appellant concedes in his reply brief that, "As to the relation between appellant and respondents, appellant did not claim that there was a true joint venture."

The other finding against the existence of a joint venture was, "That it is not true that there was a joint adventure between any lender or lenders and defendant HARRY ELKINS or any of them." (Finding X.) Whether the relationship of joint venture existed was primarily a question for the trial court to determine from the facts and inferences to be drawn therefrom. (*Cutter Laboratories* v. *R. W. Ogle & Co.*, 151 Cal.App.2d 410, 417 [311 P.2d 627]; *Spier* v. *Lang*, 4 Cal.2d 711, 716 [53 P.2d 138].) The issue before this court is whether there is substantial evidence to support the finding against the existence of a joint venture.

It is stated in 28 California Jurisprudence 2d, Joint Adventurers, section 3, pages 478-480, as follows:

"§ 3. Tests of Relationship.—To establish the existence of a joint adventure there must be proof, as in the case of a partnership, of a community of interest and a sharing of profits and losses. Moreover, each joint adventurer must have an equal right, or the right in some measure, to direct the conduct of the others through a fiduciary relation that must exist. And, generally speaking, a joint proprietary interest in the

---

[5]Plaintiff Sedia testified on cross-examination in part as follows:
"Q. Mr. Elkins didn't say anything to you that half of this 10 percent was for his broker's commission and half of it was for builder's control fee, for his work in disbursing the funds? A. No, there was no discussion on that point."

joint adventure property and joint participation in the conduct of the business are essential elements. This is not to say, however, that there cannot be a joint venture where the parties have unequal control of operations. The equal right to control the management of the enterprise properly has reference to the fact that without special agreement one joint adventurer may not have authority to bind the others. The joint adventurers may by agreement grant authority to one or more of their number that would not be implied from the relationship alone. Nor is it necessary that the property forming the capital of the adventure be jointly owned by the parties. █ Thus, where the evidence clearly shows the parties' intention to engage in a joint enterprise for profit, the principles governing joint venture apply irrespective of how title to property is taken. Furthermore, a substantial contribution can be made to a joint enterprise by the furnishing of knowledge, skill, and services, as well as by money.'' (See *Stilwell* v. *Trutanich*, 178 Cal.App.2d 614, 618-620 [3 Cal.Rptr. 285].)

█ The trial court was justified in finding no joint venture since: (a) there was no sharing of profits or losses (i.e. the lenders received *1 per cent per month* interest only); (b) appellant specifically agreed that the lenders should suffer no losses and personally guaranteed to hold the lenders harmless; (c) the lenders had no management control once the loan had been made; (d) lenders merely supplied the money; (e) no lenders had authority to act on behalf of appellant; (f) no joint venture tax returns were filed; and (g) the deeds of trust were taken in the lenders' names only.

Appellant next contends that the evidence is insufficient to support the finding that each loan was a separate transaction. The trial court found that appellant negotiated ''. . . a total of twenty-three (23) different loans to be secured by real property. That each of said loans so negotiated was a separate and distinct transaction.'' (Finding I.)

█ Appellant in attacking the sufficiency of the evidence to support this finding attempts to bring himself within the protective ambit of Civil Code section 3081.8, which provided in part that ''The provisions of this chapter do not apply to any bona fide loan secured in whole or in part by a first mortgage or first trust deed, *the principal sum of which amounts to more than ten thousand dollars ($10,000). . . .*'' (Emphasis added.) He cites *Weiss* v. *Brandt*, 137 Cal.App.2d 710 [290 P.2d 626] and *Wolf* v. *Aero Factors Corp.*, 221 F.2d 291, to

support his proposition that ''Where a series of loans are made pursuant to a basic agreement to make them, the individual loans are not separate transactions.'' Neither the *Weiss* case nor the *Wolf* case is comparable to the case at bar.

Here there were 23 separate loans; 23 separate escrows; different lenders; different borrowers or combinations thereof; and appellant received 23 separate commissions. Not one of the transactions involved a principal sum in excess of $10,000. There is sufficient substantial evidence to support the trial court's determination that each loan was a separate transaction.

Finally, appellant asserts that the evidence is insufficient to support the finding that the transactions were fully executed on the date the loan was made. The trial court found, in pertinent part, ''That each of said contracts became fully executed on the date the loan was made, . . .'' (Finding V.)

The evidence shows that the brokerage commission was paid to appellant at the close of escrow; a loan closing statement was issued at the making of the loan; the deed of trust securing the loan and promissory note evidencing the same were delivered through escrow; and all monies were disbursed from escrow to appellant at the close of escrow.

It is clear from the above that all matters to be done by respondents incident to the obtaining of a loan were done at the close of escrow, the time of making each of said 23 loans.

On the other hand, it is equally clear that appellant had not fully performed his agreement with the particular lender at the close of the escrow. As indicated above appellant's agreements with the various lenders required him to act as disbursing agent. ▬ Even assuming that the evidence was insufficient as claimed, the rule is that the absence of evidence to support a finding will cause reversal of a judgment only when it necessarily rests upon that finding. (*Wright* v. *Wright*, 148 Cal.App.2d 257, 271 [306 P.2d 536].)

The judgment in this case does not rest in considerable part upon the finding in question.

For the reasons stated the judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied April 9, 1962, and appellants' petition for a hearing by the Supreme Court was denied May 9, 1962.