[L. A. No. 28698. In Bank. Dec. 12, 1968.]

RAYMOND E. CONNOR et al., Plaintiffs, Cross-defendants and Appellants, v. GREAT WESTERN SAVINGS AND LOAN ASSOCIATION, Defendant, Cross-defendant and Respondent; MEYER PRITKIN et al., Defendants, Cross-complainants and Appellants.

[L.A. No. 28699. In Bank. Dec. 12, 1968.]

JAMES L. BURGESS et al., Plaintiffs, Cross-defendants and Appellants, v. GREAT WESTERN SAVINGS AND LOAN ASSOCIATION, Defendant, Cross-defendant and Respondent; MEYER PRITKIN et al., Defendants, Cross-complainants and Appellants.

(Consolidated Appeals.)

854

Harris K. Lyle, Edward L. Lascher, Lyle & Di Giuseppe and James Di Giuseppe for Plaintiffs, Cross-defendants and Appellants.

Overton, Lyman & Prince, Ernest E. Johnson, Phyllis M. Hix, John McClure and Lynn O. Poulson for Defendants, Cross-complainants and Appellants.

Thomas L. Fike, Thomas Schneider, Cherie A. Gaines, Mark C. Peery, Fadem & Kanner, Jerrold D. Fadem, Ernest L. Graves and Gideon Kanner as Amici Curiae on behalf of Plaintiffs, Cross-defendants and Appellants and Defendants, Cross-complainants and Appellants.

Swerdlow, Glikbarg & Shimer, Irving A. Shimer, Michael H. Shapiro and William D. Moore for Defendant, Cross-defendant and Respondent.

Thomas C. Lynch, Attorney General, Herbert E. Wenig, Assistant Attorney General, Anthony C. Joseph, Deputy Attorney General, Kaplan, Livingston, Goodwin, Berkowitz & Selvin, Herman F. Selvin, Charles E. Jones, Landels, Ripley, Gregory & Diamond, Edward D. Landels, Morrison, Foerster, Holloway, Clinton & Clark, Paul E. Homrighausen and Melvin R. Goldman as Amici Curiae on behalf of Defendant, Cross-defendant and Respondent.

TRAYNOR, C. J.—These consolidated appeals are from a judgment of nonsuit in favor of defendant Great Western Savings and Loan Association in two actions consolidated for trial.

Plaintiffs in each action purchased single-family homes in a residential tract development known as Weathersfield, located on tracts 1158, 1159, and 1160 in Ventura County. Thereafter their homes suffered serious damage from cracking caused by ill-designed foundations that could not withstand the expansion and contraction of adobe soil. Plaintiffs accordingly sought rescission or damages from the various parties involved in the tract development.

Holders of promissory notes secured by second deeds of trust on the homes filed cross-complaints, alleging that their security had been impaired by the damage to the homes. They sought to impose liens on any recovery plaintiffs might obtain from other defendants.

There was abundant evidence that defendant Conejo Valley Development Company, which built and sold the homes, negligently constructed them without regard to soil conditions prevalent at the site. Specifically, it laid slab foundations on adobe soil without taking proper precautions

recommended to it by soil engineers. When the adobe soil expanded during rainstorms two years later, the foundations cracked and their movement generated further damage.

In addition to seeking damages from Conejo, plaintiffs sought to hold Great Western liable, either on the ground that its participation in the tract development brought it into a joint venture or a joint enterprise with Conejo, which served to make it vicariously liable, or on the ground that it breached an independent duty of care to plaintiffs.

A brief review of the negotiations leading to Great Western's role in the development of the Weathersfield tract is essential to a clear perspective of the issues. ■ Since the appeals are from a judgment of nonsuit, such a review must give to plaintiffs' evidence all the value to which it is legally entitled, must recognize every legitimate inference that may be drawn from that evidence, and must disregard conflicting evidence. (*Raber* v. *Tumin* (1951) 36 Cal.2d 654, 656 [226 P.2d 574]; *Blumberg* v. *M. & T., Inc.* (1949) 34 Cal.2d 226, 229 [209 P.2d 1].) If there is evidence that would support a recovery against Great Western on either of the grounds set forth by plaintiffs, the judgment of nonsuit must be reversed.

The Weathersfield project originated in December 1958, when Harris Goldberg, president of South Gate Development Company, undertook negotiations to purchase for South Gate 547 acres of the McRea ranch, a parcel of approximately 1,600 acres of undeveloped real property in the Conejo Valley, which was then undergoing the beginnings of large-scale development. Goldberg and Keith Brown together owned and controlled South Gate Development Company. They planned to develop the property with the goal of creating a community of approximately 2,000 homes.

Neither Goldberg nor Brown had any significant experience in large-scale construction of tract housing. Goldberg had left the men's apparel business in 1955 to begin a career in real estate. He subsequently established a number of companies that engaged principally in subdividing raw acreage. In 1958 he undertook the construction of a 31-home development called Waverly Manor; when 15 or 20 homes had been partially completed under the supervision of a South Gate employee, he engaged Brown to supervise completion of the job. This task was Brown's first experience with tract construction, although he had been licensed as a general contractor in 1950 and had built approximately 50 single-family dwellings on an individual custom basis before 1958.

In January 1959 South Gate signed an agreement to purchase 100 acres of the McRea ranch for $340,000 within 120 days, and a conditional sales agreement to purchase 447 adjoining acres for $2,500 per acre over a 10-year period. Neither South Gate nor Goldberg had the financial resources to perform these agreements, and in March Goldberg approached Great Western for the necessary funds to purchase the 100-acre parcel on which Weathersfield was to be constructed.

Great Western processed between 8,000 and 9,000 loans each year, amounting to more than $100,000,000, but had not previously made loans in Ventura County. It expressed an interest to Goldberg in developing a volume of new construction loan business and in providing long-term financing in the form of first trust deeds to the buyers of the homes to be built. By the end of April, the general outlines of an agreement with Goldberg had been developed, and they were recorded in the minutes of Great Western's Loan Committee.

During the ensuing four months the parties and their lawyers worked out the details of a transaction whereby Great Western would supply the funds necessary to enable Goldberg to purchase the 100-acre parcel and construct homes thereon. In return, Great Western was given the right to make construction loans on the homes to be built and the right of first refusal to make long-term loans to the buyers of the homes. Before agreeing to provide money for the purchase of the land, Great Western also demanded and received a ''gentleman's agreement'' that it would have the right of first refusal to make construction loans on the homes to be built on the adjoining 447-acre parcel.[1]

Great Western employed a geologist to determine whether an adequate quantity and quality of water would be available in the area. As a result of the geologist's report and its own investigations, Great Western further demanded and received a guarantee from South Gate, Goldberg, and Mr. and Mrs. Brown that if Great Western held title to the 100-acre parcel in September 1960, adequate water service lines from a new or existing public utility would be available at the property line for consumer use.

In July, Great Western provided the necessary funds for the purchase of the Weathersfield tract. Goldberg had deposited $190,000 of the $340,000 purchase price with the escrow

---

[1]Although Goldberg testified at the trial that he rejected Great Western's demand for such a right of first refusal, his testimony was to the contrary in a 1965 deposition that was also introduced.

agent on behalf of South Gate. He apparently obtained the money by draining assets from his corporations, leaving a combined net worth in those enterprises of $36,000 as of July 31.

Goldberg, by amended escrow instructions, substituted Conejo Development Company in place of South Gate as purchaser of the land from the McReas, and all funds deposited theretofore by South Gate were credited to Conejo. Conejo had been incorporated several months earlier, though with only $15,000 capital to handle the tract development.

Great Western deposited the remaining $150,000 of the purchase price in a second escrow opened between Conejo as seller and Great Western as buyer, took title to the land from Conejo, and granted South Gate a one-year option to repurchase the land in three parcels for a total of $180,000. South Gate, Goldberg, and Mr. and Mrs. Brown agreed to repurchase the property from Great Western on demand for $200,000 if the option were not exercised and adequate water facilities were not available by September 1960.

The arrangement for the purchase of the land by Great Western was an early example of what has come to be known as "land warehousing." Under such an arrangement, a financial institution holds land for a developer until he is ready to use it. Unlike a normal bailee of personal property, however, the institution retains title to the property as well as the right to possession.

At the outset Great Western confronted the problem that it could not lend Goldberg $150,000 outright and still retain the land as security, for section 7155 of the Financial Code prohibited it from lending more than $33\frac{1}{3}$ percent of the appraised value of unimproved property.[2] It therefore sought to circumvent the specific statutory prohibition by disguising what was in substance admittedly a loan as the kind of investment in real property that was sanctioned by section 6705 of the Financial Code.[3]

Great Western agreed to make the necessary construction loans to Conejo only after assuring itself that the homes

---

[2] In 1961 the statute was amended to allow savings and loan associations to lend up to 70 percent of the appraised value of unimproved property.

[3] In 1959 section 6705 read in part: "An association may invest in real property and such investment may include subdividing and developing real property and building homes and other buildings on such property principally for residential use by veterans on such property. An association may own, rent, lease, manage, operate for income, or sell such property."

could be successfully built and sold. During the negotiations on the terms of the contemplated construction loans to Conejo and the long-term loans to be offered to the buyers of homes in the proposed development, Great Western investigated Goldberg's financial condition and learned that it was weak. Moreover, Great Western received, without comment or inquiry, an August 1959 financial statement from Conejo that set forth capital of $325,000, of which $320,000 was accounted for as estimated profits from the sales of homes when the sales transactions, then in escrow, were completed. Such an entry was far outside the bounds of generally accepted accounting principles. The estimated profits, representing 64/65 of the total purported capital, were not only hypothetical, but were hypothesized on the basis of houses that had not yet been constructed.

Great Western delved no deeper into the proposed foundations of the houses than into the conjectural bases of Conejo's capital. It did require Conejo to submit plans and specifications for the various models of homes to be built, cost breakdowns, a list of proposed subcontractors and the type of work each was to perform, and a schedule of proposed prices. Conejo, which at no time employed an architect, purchased plans and specifications from a Mr. L. C. Majors that he had prepared for other developments, and submitted them to Great Western.

Great Western departed from its normal procedure of reviewing and approving plans and specifications before making a commitment to provide construction funds. It did not examine the foundation plans and did not make any recommendations as to the design or construction of the houses. It was preoccupied with selling prices and sales. It suggested increases in Goldberg's proposed selling prices, which he accepted. It also refused any formal commitment of funds to Conejo until a specified number of houses were pre-sold, namely, sold before they were constructed.

Prospective buyers reserved lots after inspecting three landscaped and furnished model homes standing on 1.6 acres of the otherwise barren tract. The model homesites as well as a 60-foot wide access road had been granted by the McReas directly to Conejo ''without consideration and as an accommodation'' two weeks before the close of the land-purchase escrows.[4]

---

[4]The record does not disclose the source of the $111,000 supplied by Conejo to build and landscape the model homes. A permanent loan covering the cost of construction was eventually received from Great Western.

When Conejo sold the lots, its sales agents informed the buyers that Great Western was willing to make long-term loans secured by first trust deeds to approved persons, and obtained credit information for later submission to Great Western. This procedure was dictated by the right of first refusal that Conejo agreed to give Great Western to obtain the construction loans. If an approved buyer wished to obtain a long-term loan elsewhere, Great Western had 10 days to meet the terms of the proposed financing; if it met the terms and the loan was not placed with Great Western, Goldberg, Brown, and South Gate were required to pay Great Western the fees and interest obtained by the other lender in connection with the loan. Most of the buyers of homes in the Weathersfield tract applied to Great Western for loans. They obtained approximately 80 percent of the purchase price in the form of 24-year loans from Great Western at 6.6 percent interest secured by first trust deeds. Great Western charged Conejo a 1 percent fee for loans made to qualified buyers, and a 1½ percent fee for loans made to Conejo on behalf of buyers who, in Great Western's opinion, were poor risks.

By September, the specified number of houses had been reserved by buyers, and Great Western accordingly made approximately $3,000,000 in construction loans to Conejo. Conejo agreed to pay Great Western a 5 percent construction loan fee and 6.6 percent interest on the construction loans as disbursed for six months and thereafter on the entire amount. Great Western had originally demanded 6.6 percent interest on the entire amount without regard to the disbursement of the funds, and its 5 percent loan fee was higher than normal because it assessed the loan as one involving a substantial risk. When the construction loans were recorded, Conejo became entitled to advances on the loans and to "land draws," lump sums calculated as a percentage of the value of the land. Conejo received advances on the construction loans and land draws in the sum of $148,200. It turned this sum together with $31,800 over to South Gate, which in turn paid the total of $180,000 back to Great Western in the exercise of its option to repurchase the 100-acre tract from Great Western. South Gate simultaneously transferred the land to Conejo.

Conejo accepted notes secured by second trust deeds from the buyers of homes for the balance of the purchase price that was not provided by Great Western. Goldberg planned to discount the notes at 50 percent of their face value and to

use the proceeds to pay the interest and fees to Great Western and provide a profit to Conejo. The evidence indicates, however, that in his enthusiasm to develop the first 100 acres of his projected community, Goldberg pared estimated profits to the dangerously thin margin of $500 per house, and that he exceeded his depth in expertise and finances, with a resulting deterioration in his financial position as construction progressed. Conejo ultimately pledged the notes as security for a $300,000 loan, 43 percent of their face value, forfeiting profits in the urgent need for liquid capital. This loan was obtained from cross-complainants Meyer Pritkin et al. seven business acquaintances of Goldberg who at his suggestion organized a joint venture in December 1959 to purchase 382 acres of land in the Conejo Valley.

A subcontractor employed by Conejo began grading the property before Great Western made a final commitment to provide construction loan funds, and while Great Western still nominally owned the land. During the course of construction, Great Western's inspectors visited the property weekly to verify that the pre-packaged plans were being followed and that money was disbursed only for work completed. Under the loan agreement, if construction work did not conform to plans and specifications, Great Western had the right to withhold disbursement of funds until the work was satisfactorily performed; failure to correct a nonconformity within 15 days constituted a default. Representatives of Great Western remained in constant communication with the developers of the Weathersfield tract until all the houses were completed and sold in mid-1960.

The evidence establishes without conflict that there was no express agreement either written or oral creating a joint venture or joint enterprise relationship between Great Western and Conejo or Goldberg. Without exception the testimony of the principal witnesses discloses specific disclaimers of all intention that any such relationship should exist, and the written documents provided only for typical option and purchase agreements and loan and security transactions. Plaintiffs contend, however, that the evidence of the conduct of the parties demonstrates that neither the documents nor the testimony as to the parties' intentions accurately reflect their legal relationship. They assert that such evidence of conduct supports an inference that a joint venture or joint enterprise relationship existed. (See Civ. Code, § 1621; *Universal Sales Corp. v. California Press Mfg. Co.* (1942) 20 Cal.2d 751, 764-765 [128 P.2d 665]; *Nelson v. Abraham* (1947) 29 Cal.2d

745, 749-750 [177 P.2d 931]; *Holtz* v. *United Plumbing & Heating Co.* (1957) 49 Cal.2d 501, 506-507 [319 P.2d 617].)

▮ A joint venture exists when there is "an agreement between the parties under which they have a community of interest, that is, a joint interest, in a common business undertaking, an understanding as to the sharing of profits and losses, and a right of joint control." (*Holtz* v. *United Plumbing & Heating Co., supra,* 49 Cal.2d 501, 506-507. See also *Nelson* v. *Abraham, supra,* 29 Cal.2d 745, 749; *Spier* v. *Lang* (1935) 4 Cal.2d 711, 716 [53 P.2d 138]; *Quinn* v. *Recreation Park Assn.* (1935) 3 Cal.2d 725, 728 [46 P.2d 144].)

▮ Although the evidence establishes that Great Western and Conejo combined their property, skill, and knowledge to carry out the tract development, that each shared in the control of the development, that each anticipated receiving substantial profits therefrom, and that they cooperated with each other in the development, there is no evidence of a community or joint interest in the undertaking. Great Western participated as a buyer and seller of land and lender of funds, and Conejo participated as a builder and seller of homes. Although the profits of each were dependent on the overall success of the development, neither was to share in the profits or the losses that the other might realize or suffer. Although each received substantial payments as seller, lender, or borrower, neither had an interest in the payments received by the other.[5] Under these circumstances, no joint venture existed. (See *Wallace* v. *Pacific Elec. Ry. Co.* (1930) 105 Cal.App. 664, 667 [288 P. 834]; *Martin* v. *Ajax Constr. Co.* (1954) 124 Cal.App.2d 425, 433 [269 P.2d 132]; *Enos* v. *Picacho Gold Min. Co.* (1943) 56 Cal.App.2d 765, 770-772 [133 P.2d 663]; *United Farmers Assn.* v. *Sakiota* (1935) 7 Cal.App.2d 559, 560 [46 P.2d 770]; *Sedia* v. *Elkins* (1962) 201 Cal.App.2d 440, 451 [20 Cal.Rptr. 278]; Nichols, *Joint Venturers* (1950) 36 Va.L.Rev. 425, 438-439. Cf. *Martter* v. *Byers* (1946) 75 Cal.App.2d 375, 384 [171 P.2d 101]; *Lasry* v. *Lederman* (1957) 147 Cal.App.2d 480, 486 [305 P.2d 663]; *Stilwell* v. *Trutanich* (1960) 178 Cal.App.2d 614, 620 [3 Cal. Rptr. 285].)[6]

---

[5]We need not consider plaintiffs' contention that some of the testimony of Judge Alfred Gitelson, Goldberg's former counsel in real property matters, was improperly struck from the record; consideration of the testimony would not alter the conclusion that there is no evidence of a community or joint interest in the undertaking.

[6]For the same reasons, the evidence is insufficient to support an inference that there was a joint enterprise. The term "joint enterprise" is

■ Even though Great Western is not vicariously liable as a joint venturer for the negligence of Conejo, there remains the question of its liability for its own negligence. Great Western voluntarily undertook business relationships with South Gate and Conejo to develop the Weathersfield tract and to develop a market for the tract houses in which prospective buyers would be directed to Great Western for their financing. In undertaking these relationships, Great Western became much more than a lender content to lend money at interest on the security of real property. It became an active participant in a home construction enterprise. It had the right to exercise extensive control of the enterprise. Its financing, which made the enterprise possible, took on ramifications beyond the domain of the usual money lender. It received not only interest on its construction loans, but also substantial fees for making them, a 20 percent capital gain for ''warehousing'' the land, and protection from loss of profits in the event individual home buyers sought permanent financing elsewhere.

Since the value of the security for the construction loans and thereafter the security for the permanent financing loans depended on the construction of sound homes, Great Western was clearly under a duty of care to its shareholders to exercise its powers of control over the enterprise to prevent the construction of defective homes. Judged by the standards governing nonsuits, it negligently failed to discharge that duty. It knew or should have known that the developers were inexperienced, undercapitalized, and operating on a dangerously thin capitalization. It therefore knew or should have known that damage from attempts to cut corners in construction was a risk reasonably to be foreseen. (See Lefcoe & Dobson, *Savings Associations as Land Developers* (1966) 75 Yale L.J. 1271, 1293.)[7] It knew or should have known of the

---

sometimes used interchangeably with ''joint venture'' and sometimes to describe a nonprofit undertaking for the mutual benefit or pleasure of the parties. (See *Shook* v. *Beals* (1950) 96 Cal.App.2d 963, 967-968 [217 P.2d 56, 18 A.L.R.2d 919]; 2 Williston, Contracts (3d ed. 1959) § 318, pp. 554-555.) When used to describe a business or commercial undertaking, however, California decisions draw no significant distinctions between joint ventures and joint enterprises. (See, e.g., *Boyd* v. *White* (1954) 128 Cal.App.2d 641, 657 [276 P.2d 92]; *Larson* v. *Lewis-Simas-Jones Co.* (1938) 29 Cal.App.2d 83, 89 [84 P.2d 296]; *Ambrose* v. *Alioto* (1944) 65 Cal.App.2d 362, 366 [150 P.2d 502].)

[7]For example, Goldberg refused to follow the suggestion of soil engineers that Conejo comply with FHA grading standards requiring all homes to drain to the street, because the cost would be an extra $200 per lot.

expansive soil problem,[8] and yet it failed to require soil tests, to examine foundation plans, to recommend changes in the pre-packaged plans and specifications, or to recommend changes in the foundations during construction. It made no attempt to discover gross structural defects that it could have discovered by reasonable inspection and that it would have required Conejo to remedy. It relied for protection solely upon building inspectors with whom it had had no experience to enforce a building code with the provisions of which it was ignorant. The crucial question remains whether Great Western also owed a duty to the home buyers in the Weathersfield tract and was therefore also negligent toward them.

The fact that Great Western was not in privity of contract with any of the plaintiffs except as a lender does not absolve it of liability for its own negligence in creating an unreasonable risk of harm to them. "Privity of contract is not necessary to establish the existence of a duty to exercise ordinary care not to injure another, but such duty may arise out of a voluntarily assumed relationship if public policy dictates the existence of such a duty." (*Merrill* v. *Buck* (1962) 58 Cal.2d 552, 561-562 [25 Cal.Rptr. 456, 375 P.2d 304]. See, e.g., *Biakanja* v. *Irving* (1958) 49 Cal.2d 647, 650 [320 P.2d 16, 65 A.L.R.2d 1358] ; *Lucas* v. *Hamm* (1961) 56 Cal.2d 583, 588 [15 Cal.Rptr. 821, 364 P.2d 685] ; *Stewart* v. *Cox* (1961) 55 Cal.2d 857, 863 [13 Cal.Rptr. 521, 362 P.2d 345].) The basic tests for determining the existence of such a duty are clearly set forth in *Biakanja* v. *Irving, supra,* 49 Cal.2d 647, 650, as follows: "The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are [1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm."

---

[8]Adobe soil is common in southern California. Tests conducted by Conejo's soil engineers indicated the presence of adobe soil. Such soil is distinguished easily by the naked eye in dry weather in areas where the ground cover is sparse; when it dries and contracts, the surface cracks into plates, frequently hexagonal in shape and 10 or 12 inches in diameter. Several Conejo employees noticed the characteristic cracks during the summer of 1959, as did the geologist hired by Great Western to investigate water supply problems.

In the light of the foregoing tests Great Western was clearly under a duty to the buyers of the homes to exercise reasonable care to protect them from damages caused by major structural defects.

[1] Great Western's transactions were intended to affect the plaintiffs significantly.

The success of Great Western's transactions with South Gate and Conejo depended entirely upon the ability of the parties to induce plaintiffs to buy homes in the Weathersfield tract and to finance the purchases with funds supplied by Great Western. Great Western's agreement to supply funds to Conejo to build homes in return for a 5 percent construction loan fee and 6.6 percent interest, was on condition that a sufficient number of persons first made commitments to buy homes. Great Western agreed to warehouse land for Conejo on the understanding that the land would be used for a residential subdivision. Great Western also stipulated that advances from its construction loans would be used by Conejo to exercise repurchase options, thereby affording Great Western the opportunity for a $30,000 capital gain. Finally, Great Western took steps to have Conejo channel buyers of homes to its doors for loans, extracting a 1 percent loan fee from Conejo in the process.

[2] Great Western could reasonably have foreseen the risk of harm to plaintiffs.

Great Western knew or should have known that neither Goldberg nor Brown had ever developed a tract of similar magnitude. Great Western knew or should have known that Conejo was operating on a dangerously thin capitalization, creating a readily foreseeable risk that it would be driven to cutting corners in construction. That risk was enlarged still further by the additional pressures on Conejo ensuing from its onerous burdens as a borrower from Great Western.

[3] It is certain that plaintiffs suffered injury.

Counsel stipulated that each of the plaintiff homeowners, if called, would testify that their respective homes sustained damage in varying degrees "of the character of which we have been concerned in this action." Sufficient evidence was presented to show by way of example the existence of damage to the homes and therefore injury to plaintiffs. Under the terms of the pretrial order, the extent of each plaintiff's injury is to be litigated in further proceedings after the question of Great Western's liability is determined.

[4] The injury suffered by plaintiffs was closely connected with Great Western's conduct.

Great Western not only financed the development of the Weathersfield tract but controlled the course it would take. Had it exercised reasonable care in the exercise of its control, it would have discovered that the pre-packaged plans purchased by Conejo required correction and would have with-held financing until the plans were corrected.[9]

[5] Substantial moral blame attaches to Great Western's conduct.

The value of the security for Great Western's construction loans as well as the projected security for its long-term loans to plantiffs depended on the soundness of construction. Great Western failed of its obligation to its own shareholders when it failed to exercise reasonable care to preclude major structural defects in the homes whose construction it financed and controlled. It also failed of its obligation to the buyers, the more so because it was well aware that the usual buyer of a home is ill-equipped with experience or financial means to discern such structural defects. (Cf. *Schipper* v. *Levitt & Sons, Inc.* (1965) 44 N.J. 70 [207 A.2d 314, 325-326].) Moreover a home is not only a major investment for the usual buyer but also the only shelter he has. Hence it becomes doubly important to protect him against structural defects that could prove beyond his capacity to remedy.

[6] The admonitory policy of the law of torts calls for the imposition of liability on Great Western for its conduct in this case. Rules that tend to discourage misconduct are particularly appropriate when applied to an established industry.

By all the foregoing tests, Great Western had a duty to exercise reasonable care to prevent the construction and sale of seriously defective homes to plaintiffs. The countervailing considerations invoked by Great Western and amici curiae are that the imposition of the duty in question upon a lender will increase housing costs, drive marginal builders out of business, and decrease total housing at a time of great need. These are conjectural claims. In any event, there is no endur-

---

[9]The vice-president in charge of Great Western's tract loan development activities testified that had Great Western known of the soil condition it would have required soil tests and the correction of plans before approving a construction loan. Although Conejo had the right to seek another lender at any time to continue as financier of the project, there is no reason to assume that such lender would not have exercised reasonable care and imposed similar requirements.

ing social utility in fostering the construction of seriously defective homes. If reliable construction is the norm, the recognition of a duty on the part of tract financiers to home buyers should not materially increase the cost of housing or drive small builders out of business.[10] If existing sanctions are inadequate, imposition of a duty at the point of effective financial control of tract building will insure responsible building practices.[11] Moreover, in either event the losses of family savings invested in seriously defective homes would be devastating economic blows if no redress were available.

Defendants contend, however, that the question of their liability is one of policy, and hence should be resolved only by the Legislature after a marshalling of relevant economic and social data. There is no assurance, however, that the Legislature will undertake such a task, even though tract financing grows apace. In the absence of actual or prospective legislative policy, the court is free to resolve the case before it, and indeed must resolve it in terms of common law.

 Great Western contends that lending institutions have relied on an assumption of nonliability and hence that a rule imposing liability should operate prospectively only. In the past, judicial decisions have been limited to prospective operation when they overruled earlier decisions upon which parties had reasonably relied and when considerations of fairness and public policy precluded retroactive effect. (*Forster Shipbuilding Co.* v. *County of Los Angeles* (1960) 54 Cal.2d 450, 458-459 [6 Cal.Rptr. 24, 353 P.2d 736].) Conceivably

---

[10]In 1965 a state legislative committee found that hundreds of homes built upon expansive soil in California had cracked to such an extent as to make continued habitation uncomfortable or unsafe, that the existence of such soil could be easily and cheaply identified, that the cost of engineering solutions was minimal and easily financed by the builder and homebuyer, and that ''local ordinances requiring soil analysis prior to home construction are virtually nonexistent,'' leaving the potential homebuyer ''without minimum assurance that his purchase will be a safe and habitable home.'' (6 Assembly Interim Com. Report No. 21, Municipal and County Government (1965) p. 9, ''Problems of Construction Upon Expansive Soil.'') In 1965 soil analysis and precautionary measures were required by state statute. (Health & Saf. Code, §§ 17953, 17954.)

[11]The residential construction industry is composed principally of small builders, most of whom have so little equity that they must borrow money in order to finance the production of new homes. (See Gillies and Mittelbach, Management in the Light Construction Industry (1962) pp. 15-16, 19, 21; Gillies & Curtis, Institutional Residential Mortgage Lending in Los Angeles County (1956) pp. 41-42.) Savings and loan associations are bound by market forces and legal restraints to be a major supplier of funds to such small builders. (Lefcoe and Dobson, *supra*, 75 Yale L.J. 1271, 1284-1286.)

such a limitation might also be justified when there appeared to be a general consensus that there would be no extension of liability. Such is not the case here. At least since *MacPherson* v. *Buick Motor Co.* (1916) 217 N.Y. 382 [111 N.E. 1050, L.R.A. 1916F 696], there has been a steady expansion of liability for harm caused by the failure of defendants to exercise reasonable care to protect others from reasonably foreseeable risks. (See generally Prosser, The Law of Torts (3d ed. 1964) ch. 19.) By the time of the decision in *Sabella* v. *Wisler* (1963) 59 Cal.2d 21 [27 Cal.Rptr. 689, 377 P.2d 889], such liability had been imposed on a builder who negligently constructed a seriously defective home. (See also *Stewart* v. *Cox, supra,* 55 Cal.2d 857.) Those in the business of financing tract builders could therefore reasonably foresee the possibility that they might be under a duty to exercise their power over tract developments to protect home buyers from seriously defective construction. Moreover, since the value of their own security depends on the construction of sound homes, they have always been under a duty to their shareholders to exercise reasonable care to prevent the construction of defective homes. Given that traditional duty of care, a lending institution should have been farsighted enough to make such provisions for potential liability as would enable it to withstand the effects of a decision of normal retrospective effect.

Great Western contends finally that the negligence of Conejo in constructing the homes and the negligence of the county building inspectors in approving the construction were superseding causes that insulate it from liability. Conejo's negligence could not be a superseding cause, for the risk that it might occur was the primary hazard that gave rise to Great Western's duty. " 'If the realizable likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious or criminal does not prevent the actor from being liable for harm caused thereby.' " (*Richardson* v. *Ham* (1955) 44 Cal.2d 772, 777 [285 P.2d 269], quoting Rest. Torts, § 449; see also Rest.2d Torts, § 449; *Weaver* v. *Bank of America* (1963) 59 Cal.2d 428, 433-434 [30 Cal.Rptr. 4, 380 P.2d 644].)

The negligence of the building inspectors, confined as it was to inspection, could not serve to diminish, let alone spirit away, the negligence of the lender. Great Western's duty to plaintiffs was to exercise reasonable care to protect them from seriously defective construction whether caused by defective

plans, defective inspection, or both, and its argument that there was a superseding cause of the harm "is answered by the settled rule that two separate acts of negligence may be the concurring proximate causes of an injury. (*Fennessey* v. *Pacific Gas & Elec. Co.*, 20 Cal.2d 141, 145 [124 P.2d 51]; *Lacy* v. *Pacific Gas & Elec. Co.*, 220 Cal. 97, 98 [29 P.2d 781]; . . .)" (*Merrill* v. *Buck, supra*, 58 Cal.2d 552, 563.)

The question remains whether granting a nonsuit in favor of Great Western against cross-complainants was also erroneous. As pledgees of promissory notes secured by second deeds of trust, cross-complainants seek to hold Great Western liable for the impairment to their security caused by the damage to the homes and to impose liens on any recovery plaintiffs may obtain from Great Western or other defendants. By stipulation and pretrial order the parties agreed that the issue of Great Western's liability should be determined first and that thereafter the rights and liabilities of the other parties among themselves should be determined. The question whether cross-complainants are entitled to liens on any recoveries plaintiffs may obtain from Great Western has therefore not yet been litigated. (Cf. *American Sav. & Loan Assn.* v. *Leeds* (1968) 68 Cal.2d 611 [68 Cal.Rptr. 453, 440 P.2d 933].) Accordingly, it was error to grant a nonsuit against cross-complainants as well as against plaintiffs, for in further proceedings cross-complainants may be able to establish some basis for sharing in plaintiffs' recoveries.

For the purposes of such proceedings, however, we also hold that Great Western owed no independent duty of care to cross-complainants. The balance of the factors set forth in the *Biakanja* case is significantly different when an investor in or pledgee of notes secured by second deeds of trust is substituted for a member of the home-buying public as the party claiming a duty of care on the part of the tract financier. Although some factors may indicate no difference between plaintiffs and cross-complainants insofar as Great Western's duties are concerned, others point toward a duty to plaintiffs but not toward a duty to cross-complainants.

The foreseeability of harm to cross-complainants as a result of defective construction was substantially less than in the case of plaintiffs. As security cross-complainants had notes from the home owners as well as second deeds of trust. Furthermore, they assured themselves of a substantial margin of safety against the risk that the notes would not be paid or that the homes would be worth less than the purchase price

when they lent only 43 percent of the face value of the notes. Plaintiffs, on the other hand, were powerless to protect their equities in their homes from reduction or extinction by diminution of the value of the property as a result of defective construction.

Likewise, Great Western's negligence was more closely connected with plaintiffs' injuries than cross-complainants' injuries. Plaintiffs were injured by the diminution of value of their homes as a result of defective construction. Cross-complainants will be injured only if plaintiffs default on their notes and the diminution in value of the homes leaves insufficient security to protect the second trust deeds.

Finally, substantially less moral blame attached to Great Western's conduct with respect to cross-complainants than attached to its conduct with respect to plaintiffs. The roles played by cross-complainants and plaintiffs in the transaction were crucially different. Like Great Western itself, cross-complainants were investors in a business enterprise and dealt with Conejo as creditors, not as purchasers of the homes it built. As substantial creditors of Conejo, cross-complainants were voluntary co-participants with Great Western and Conejo in the enterprise of building and selling homes to the general public. Cross-complainants did not have Great Western's power to prevent defective construction through control of construction loan payments; but, unlike plaintiffs, who had no practical alternative to accepting Conejo's qualifications and responsibility on faith, cross-complainants as substantial investors were in a position to protect themselves.[12] Under these circumstances, we do not believe that either Great Western or cross-complainants were under a duty to exercise reasonable care to protect the other from negligence on the part of Conejo. Accordingly, Great Western's duty to exercise reasonable care to prevent Conejo from constructing defective homes was limited to the members of the public who bought those homes.

The parties stipulated that the homes of plaintiffs Elwood and Evelyn Guest and plaintiffs John and Grace Whitaker

[12]Goldberg's accountant is one of four cross-complainants who are co-partners doing business as Pritkin-Finkel Investment Company. He testified that the partnership made investments on the advice of accounting clients without previous investigation, that it had made approximately a dozen investments in the last several years totalling less than a million dollars, and that the deals in which it had invested involved total dollar amounts of approximately one hundred million dollars. Goldberg's former counsel in real property matters is one of two cross-complainants who are co-partners doing business as K. G. & Company.

are not located in tract 1158, 1159, or 1160. As to them, the nonsuit is affirmed. In all other respects the judgment is reversed.

Peters, J., Tobriner, J., and Sullivan, J., concurred.

MOSK, J.—I dissent.

The evidence is overwhelming, and the majority concede, that as between the lender of funds and the tract developer there was no agency, no joint venture, no joint enterprise. It is clear there was merely a lender-borrower relationship. Nevertheless, the majority here hold the lender of funds vicariously liable to third parties for the negligence of the borrower. This result is (a) unsupported by statute or precedent; (b) inconsistent with accepted principles of tort law; (c) likely to be productive of untoward social consequences.

At the threshold, it would be helpful to review some elementary economic factors and relationships that appear to be involved in this proceeding.

The function of the entrepreneur in a free market is to discern what goods or services are in apparent demand and to gather and arrange the factors of production in order to supply to the consumer, at a profit, the goods and services desired. In so doing, the entrepreneur undertakes a number of risks. The demand may be less than he calculated; the costs of production may be greater. He is not only in danger of losing his own capital investment but he incurs obligations to the suppliers of land, materials, labor and capital, and he stands liable under now-accepted principles of law for harm and loss caused by defects in his products to those persons injured thereby.

The entrepreneur undertakes these calculated risks in the hope of an ultimate substantial monetary reward resulting from the return over and above his costs, which include not only land, materials and labor but the charges incurred in obtaining capital. Indeed, "profit" has been commonly understood to be the return above expenses to innovators or entrepreneurs as the reward for their innovation and enterprise. (*People* ex rel. *Farnum* v. *San Francisco Sav. Union* (1887) 72 Cal. 199, 202-203 [13 P. 498].) The upper limit of the entrepreneur's profit is determined by his success in the market, and this results from his skill in assessing the demand for his product and his minimizing losses through skillful production.

*Conejo Valley Development Company and associated parties were entrepreneurs.*

The role of the supplier of capital is entirely different. The lender, as a supplier of capital, is to receive by contract a fixed return or price for his investment. He owns no right to participate in the profits of the enterprise no matter how great they may be. On the other hand, he is insulated from the risk of loss of capital and interest in return for making his money available, other than the risk of nonpayment of the contract obligations. Indeed, it is elementary that the owner of money lends it to an entrepreneur and receives only a fixed return, rather than obtaining the gain from using the money himself as an entrepreneur, on the condition that he be relieved of risk. The basic, underlying risk in mortgage lending is that the lender might not get back what is owed to him in principal and interest.

It seems abundantly clear, both legally and logically, that if the lender has no opportunity to share in the profits or gains beyond the fixed return for his supplying of capital, i.e., if he has no chance of reaping the entrepreneur's reward and exercises no control over the entrepreneur's business, elementary fairness requires that he should not be subjected to the entrepreneur's risks.

*Great Western Savings and Loan Association was a lender, a supplier of capital.*

By imposing the entrepreneur's risks upon the supplier of capital, even though the latter has bargained away the opportunity of participating in the entrepreneurial gain on his capital by lending it at a fixed fee, the majority have effected a drastic restructuring of traditional economic relationships. The results may reverberate throughout the economy of our state, and may seriously affect the money and investment market, the construction industry, and regulatory schemes of financial institutions, all without the faintest hint in either stautory or case authority that such a draconian result is compelled.

In fact, all available authority points to a contrary result. "The obvious drawback of the negligence solution [to this problem] is the lack of legal precedent for imposing such a duty upon the lending institution." *Lender Liability for Housing Defects* (1968) 35 U.Chi.L.Rev. 739, 758. As Justice Carter wrote in *Routh* v. *Quinn* (1942) 20 Cal.2d 488, 491 [127 P.2d 1, 149 A.L.R. 215] : "It is an elementary principle that an indispensable factor to liability founded upon negli-

gence is the existence of a duty of care owed by the alleged wrongdoer to the person injured, or to a class of which he is a member." And in *Dahms* v. *General Elevator Co.* (1932) 214 Cal. 733, 737 [7 P.2d 1013], it was also said to be "elementary, of course, that no tortious liability can be imposed on a defendant *even though it was negligent,* unless defendant owed a duty of care to plaintiff." (Italics added.) Without such a duty, any injury is as to this defendant *damnum absque injuria.* (2 Witkin, Summary of Cal. Law (1960) Torts, § 4.) The remedy is, as it should be, against the negligent builder.

It has never been doubted that the imposition of a duty implies significant control over the agency of harm. The issue of right of control goes to the very heart of the ascription of tortious responsibility, particularly where the alleged negligent conduct is asserted to be a failure to control the conduct of an independent third party.

In the absence of a special relationship a party has no duty to control the conduct of a third person, so as to prevent him from causing harm to another. (*Richards* v. *Stanley* (1954) 43 Cal.2d 60, 65 [271 P.2d 23] ; *Fuller* v. *Standard Stations, Inc.* (1967) 250 Cal.App.2d 687 [58 Cal.Rptr. 792].) No authority holds that lender-borrower is the type of relationship contemplating the duty of control over the conduct of another so as to prevent injury to third parties.

The Financial Code, which contains California statutory rules governing the operations of institutional lenders, creates no duty of care by those institutions to any parties other than their shareholders and depositors, and, of course, to governmental regulatory agencies. Indeed, the majority point out that "Great Western was clearly under a duty of care to its shareholders to exercise its powers of control over the enterprise to prevent the construction of defective homes. Judged by the standards governing nonsuits, it negligently failed to discharge *that* duty." (Italics added.) *That* duty, the only duty delineated in the majority opinion, was care to its shareholders. Assuming arguendo that negligence to shareholders is reflected in the evidence, no cause of action by these plaintiffs is stated for the obvious reason that they were not Great Western shareholders, and thus no duty was owed to them. In *Gill* v. *Mission Sav. & Loan Assn.* (1965) 236 Cal.App.2d 753 [46 Cal.Rptr. 456], the court held that a savings and loan association owed no duty of care to holders of promissory notes and subordinated trust deeds with respect to supervision

and management of construction loan funds. There, as here, it was not alleged or proved "that the defendant agreed with anyone to manage or supervise distribution of the loaned funds, assumed to do so, actually undertook such, or was required by statutory law or regulation to so manage or supervise. Nor is there any showing of a voluntarily assumed relationship between defendant and plaintiffs from which such an obligation might arise." (Pp. 756-757.)

The evidence is barren of indicia that the defendants maintained any element of control over the enterprise involved here. The record establishes without conflict that Great Western and Conejo had no mutual right to direct each other's activities. The fact that Great Western was required by law (Fin. Code, § 7156) to limit its rate of disbursements to the borrower cannot import a duty to the ultimate purchaser and is not the equivalent of a right to control the progress of development or to participate in the management of the borrower's enterprise. By regulating disbursements the lender may to some extent affect the borrower, but this is far removed from control over the borrower's business and from an affirmative duty to prevent the borrower's negligence toward third parties.

Actual control or an implied agreement to control construction is a factual question, decided against the plaintiffs here by the trier of fact. Before the written loan contract between the lender and the developer was signed and before the plans were approved, the lender could have exercised "control" over the building project only by insisting on changes in the foundation plans as a condition of making the loan. In this respect, the lender here is in no different position than any other lender and exercised no greater "control" over the building project than any other lender who can, if he wishes, withhold funds if he believes the funds will be used in a harmful manner.

Whether the lender should be under a duty to conduct an independent investigation to discover defects in the plans is an entirely different matter. The majority conclude that this duty should be imposed on the lender here because it had control of the construction enterprise. Upon analysis, however, it is clear that this control was mythical; it consisted merely of the power to refuse to lend money for the project. In this respect all lenders may be held to "control" the projects they finance. Therein lies the vice of the majority opinion.

As to the "control" exercised by Great Western after construction began, the only right it had under the contract was to withhold funds if the work did not conform to the plans. The inspections conducted by it were performed for this purpose and to comply with the statutory requirements concerning disbursement of funds. Thus, if the foundation plans appeared defective, the lender had no right under the contract to insist upon their revision.

Great Western's position, as indicated above, was no different from that of any other lender: it had no contractual or statutory right to conduct the operations of the builder-borrower. Even if it were to be established that Great Western was negligent in its duty to its own shareholders by extending loans to a builder of dubious competence, this did not set in motion the subsequent relationship of the builder to the third parties, and the builder's superseding negligence insulates Great Western from liability for whatever negligence resulted from merely lending money. "If the accident would have happened anyway, whether the defendant was negligent or not, then his negligence was not a cause in fact, and of course cannot be the legal or responsible cause." (2 Witkin, Summary of Cal. Law (1960) Torts, § 284, p. 1484.)

In short, neither the identity of the lender nor the terms of the loan had any effect whatever upon the builder's ultimate negligence. The lending of money cannot be said to have created a possibility of harm to third parties. The producing institution, here the builder, created the risk, controlled the agency of harm, and thus was the actor under a duty to minimize the risk. The defects in home construction were not caused by the lending of money; they were an incident of the process of physical construction.

The majority assert the lender knew or should have known the developers were inexperienced and undercapitalized and that there were soil problems. Assuming this to be so, the lender may have been remiss in its duty to its shareholders, but that conduct is unrelated to the builder's negligence in creating structural defects which resulted in injury to plaintiffs. The defects would have occurred if the loans were made by defendant, if they were not made by defendant, if they were made by another lending institution, or if the builders used their own resources exclusively. No relationship, however tenuous, can be established between the loans and the negligence of the builder.

The plaintiffs also rely upon the appraisals and inspections by defendant. These, however, were performed in compliance

with law and were intended to be a means of verifying the existence of the construction for which loans had been made, and of determining the progress of construction in order to regulate the disbursement rate. The appraisals and inspections were intended only for the benefit of defendant and state regulatory authorities. They were never in fact communicated to outsiders, neither the general public nor the prospective homeowners. They were not used to encourage or induce anyone to purchase homes, but were adapted solely as tools of internal management. Plaintiffs strain logic in attempting to convert these internal operations of the defendant into representations to them, negligent or otherwise.

A duty of care is imposed only upon parties creating a risk of foreseeable harm. To find that an institutional lender, merely by providing capital, creates a risk of foreseeable harm in place of or in addition to the borrower who constructs or sets the harmful agency in motion, is a novel concept of tort law. By parity of reason, a finance company would, by lending money for the purchase of an automobile, be liable for injuries to third parties caused by the owner's negligent operation of the vehicle.

The majority attempt to adapt the "balancing of various factors" in *Biakanja* v. *Irving* (1958) 49 Cal.2d 647, 650 [320 P.2d 16, 65 A.L.R.2d 1358], to the factual circumstances here. That their reliance is clearly misplaced is demonstrated by an analysis of the six tests of *Biakanja* to establish liability in the absence of privity:

1. *The extent to which the transaction was intended to affect plaintiff*. Defendant's conduct, including its appraisals, cursory inspections, and the making of loans, was intended for its own purposes exclusively, i.e. for the benefit of its shareholders and depositors. No representations were made to any prospective homeowner and there was no testimony whatever indicating any actual or prospective homeowners relied on any representations. There can be no question that the transaction was intended to affect the lender and the borrower, and was not for the benefit direct or indirect of plaintiffs.

2. *Foreseeability of harm*. The issue under this phase of the test is the foreseeability of harm resulting from the lender's actions as distinguished from the conduct of the builder. It is scarcely foreseeable by the lender, as a result of simply providing funds for construction, that gross structural defects would exist in the homes ultimately constructed by the builder, particularly in a situation in which construction was

overseen and approved by the governmental agencies of Ventura County, in which experts submitted reports on construction problems both to the builder and to the county and in which, contrary to the inferences in the majority opinion, the builder came highly recommended by another experienced lender. There is a potential risk of structural defects in any construction, but it is impossible to find particular foreseeability of construction harm merely from the act of a financial institution lending money to a builder.

3. *The degree of certainty that the plaintiffs suffered injury.* We can, for purposes of this discussion, concede that plaintiffs suffered injury. The issue is whether liability for that injury is to be imposed on the nearest solvent bystander or upon the party whose negligent conduct produced the injury.

4. *Closeness of connection between injury suffered and defendant's conduct.* The lender here built no homes, drew no plans and did not drive in a single nail. Its function was to finance and not to construct. The experience of the institutional lender is in lending money, not in building homes. In short, the two enterprises have no "closeness of connection"; they are significantly remote. There is no evidence that any purchasers knew of the existence of the defendant in its role as lender of construction funds, much less that they relied upon any activity of the lender with regard to the development.

5. *Moral blame.* Blameworthiness implies responsibility. The lender's only responsibility here was to its shareholders and depositors. If any moral blame is to be assessed, it must be by them and not the plaintiff.

6. *The policy of preventing future harm.* Rules of law or conduct intended to deter or minimize the risk of future harm are imposed only upon those creating and controlling the risk of harm. The only manner in which this policy could apply to lenders in the future—and this may be the ultimate result of the majority opinion—is by compelling lenders to become joint venturers with entrepreneurs. This, as indicated heretofore, will result in a substantial alteration in the previously accepted economic relationship between lenders and entrepreneurial borrowers.

There appear to be adequate remedies both in law and in equity for victims of negligent builders. But if home purchasers are not sufficiently protected today in their available remedies for latent constructional defects, legislative bodies can take appropriate action to revamp building codes, give

more power to regulatory agencies, make licensing requirements more strict, compel bonding of home builders, provide for industry-wide insurance. The answer does not lie in a judicially created cause of action that will compel lending institutions to assume a supervisory role in home construction. Such a requirement will raise interest rates and the cost of money and thus increase the cost of home construction. More significantly, it will place supervisory responsibility on institutions which are limited by law to financing operations and therefore ill-equipped with the skilled scientific, mechanical and engineering personnel necessary to perform a supervisory function effectively.

For all of the foregoing reasons, I would affirm the judgment.

BURKE, J.—I dissent. I agree with the Chief Justice that despite the extensive activities of Great Western here the evidence, viewed most favorably to plaintiffs, falls short of establishing the existence of a joint venture between Great Western and Conejo or Goldberg. However, I would hold a joint venture relationship to be the only basis for imposing liability upon Great Western. Its position vis-a-vis plaintiffs differs materially from the relationships between plaintiffs and defendants in the four cases upon which the majority opinion relies. (*Merrill* v. *Buck* (1962) 58 Cal.2d 552, 561-562 [25 Cal.Rptr. 456, 375 P.2d 304] [defendant real estate agent showed and rented to injured plaintiff lessee a house with latent dangerous defect]; *Biakanja* v. *Irving* (1958) 49 Cal. 2d 647, 650 [320 P.2d 16, 65 A.L.R.2d 1358] [defendant notary public drew invalid will, thereby depriving plaintiffs of intended benefits thereunder]; *Lucas* v. *Hamm* (1961) 56 Cal.2d 583, 588 [15 Cal.Rptr. 821, 364 P.2d 685] [attorney charged with drafting will with invalid trust provisions, causing loss to intended beneficiaries]; *Stewart* v. *Cox* (1961) 55 Cal.2d 857, 863 [13 Cal.Rptr. 521, 362 P.2d 345] [defendant subcontractor installed defective and leaking concrete work for swimming pool built for plaintiff].)

In each of the cited cases defendant behaved negligently in carrying out a duty of care *undertaken by defendant toward another*. But in the present case Great Western *undertook no duty* toward Conejo, Goldberg, plaintiffs, or any one else, any violation of which resulted in plaintiffs' losses. The majority opinion speaks of a negligent failure by Great Western of "a duty of care to its shareholders . . . to prevent the con-

struction of defective homes" *ante,* pp. 864, 867, 869, and on such asserted failure appears to predicate the pronouncement of an obligation to protect plaintiff home buyers from structural defects, (*ante,* p. 867.) Even assuming that certain officers or employees of Great Western were derelict in their duties of care toward Great Western and its shareholders, those officers or employees *are not the corporation*; more logically, in such a context it is the shareholders themselves who might be said to constitute the corporate entity. In my view negligent performance by corporate officers or employees of their duty of care toward the corporation and its shareholders provides no basis for imposing upon the corporation (and therefore upon its shareholders, who must bear the loss) a duty toward others (here, plaintiffs). The fallacy of such an approach is readily perceived by substituting an individual financier for Great Western. In that situation could it be said that the individual's failure to exercise prudence and care in protecting *himself* gives rise to a duty of care to others? I think not. Similarly it would appear as sound to rule that an agent's violation of his obligations to his principal would in and of itself render the principal liable to others injured in the same transaction, and up to now such has not been the law.

I would affirm the judgment.

McComb, J., concurred.

Respondent's petition for a rehearing was denied January 8, 1969. McComb, J., Mosk, J., and Burke, J., were of the opinion that the petition should be granted.