346 So.2d 603 (1977)
H.O. DUNSON and Linda H. Dunson, Appellants,
v.
STOCKTON, WHATLEY, DAVIN & CO., Appellee.
No. BB-407.
District Court of Appeal of Florida, First District.
May 27, 1977.
Rehearing Denied June 24, 1977.
*604 M.J. Menge, Shell, Fleming, Davis & Menge, Pensacola, for appellants.
Alan C. Sheppard, Theodore J. Troxel, G. Miles Davis, Nick Geeker, Charles C. Sherrill, Pensacola, Judson M. Chapman, Tallahassee, Charles Edgar, Jr., for appellee.
ERVIN, Judge.
This is an appeal by the Dunsons from a final judgment of foreclosure in favor of the mortgagee, Stockton, Whatley, Davin & Company. On January 29, 1973, the Dunsons executed a contract to purchase a lot from Mr. and Mrs. Roy L. Campbell for $20,000.00. On April 20, 1973, the Dunsons entered into an agreement with Char Pal, Inc., a construction company, under the terms of which Char Pal was to construct a house, according to certain plans and specifications to be approved by the Veterans Administration, on the lot which the Dunsons had contracted to purchase from the Campbells. The contract provided that Char Pal would have the completed house available for occupancy within 90 days from the start of construction. By the terms of the contract, the Dunsons would pay Char Pal $48,150.00 for the house, the cost of the lot and closing costs. Stockton was then furnished a copy of the construction contract.
On June 9, 1973, the warranty deed from the Campbells to the Dunsons was recorded, and on the same day the Dunsons executed a deed covering the same property to Char Pal. Mr. Charles Edgar, Jr., president of Char Pal, then executed a promissory note for $43,425.00 payable to Stockton, as well as a mortgage covering the property to secure the loan. The mortgage contained a future advance clause, not to exceed five years from date of execution, providing that the total amount of indebtedness would not exceed twice the principal amount stated in the promissory note. Prior to furnishing the construction loan to Char Pal, Stockton requested that the Dunsons apply to the V.A. for a commitment that the V.A. would insure a permanent loan of $47,950.00 which Stockton intended to make to the Dunsons when the house was completed. In due time, the Dunsons and the plans and the specifications were approved by V.A. and the needed commitment was issued.
In the fall of 1973, Char Pal encountered financial difficulties and construction was delayed because Char Pal's sub-contractors would not proceed with the construction of the house, or several other houses which Char Pal had under construction at the time, without some assurance that they would be paid. During the fall of 1973, it was necessary for Stockton to assume duties not usually associated with a mere mortgagee. From the latter part of 1973 to about the end of 1974, all checks written on Char Pal's banking account had to be countersigned by Mr. Hugh Graham, manager of Stockton's Pensacola office. It was not until January of 1974 that the construction of the house actually commenced. In October, 1974, Char Pal and Stockton decided that it would require an additional $5,000.00 above the amount initially loaned to Char Pal. On October 31, 1974, Char Pal executed a promissory note for $5,000.00 payable to Stockton and a mortgage modification agreement. The Dunsons had no actual knowledge of this note and the mortgage modification.
In November or December, 1974, Stockton assumed further control over Char Pal's operation. Mr. Sid Gervin from Stockton's Jacksonville office was moved to Pensacola and commenced operating out of Char Pal's office. Charles Edgar, Jr., president of Char Pal, was placed on Stockton's payroll and paid $500.00 per week to supervise construction *605 of the Dunson's house and the other houses Char Pal had under construction. All checks written on Char Pal's banking account were signed by either Mr. Graham or Mr. Gervin of Stockton after December, 1974.
In December, 1974, Art Zachary and Sid Gervin from Stockton met with the Dunsons at the site where the Dunsons' house was being constructed. They advised the Dunsons that Stockton was taking over the construction of the house and that the Dunsons could expect to move into the house by the end of January, 1975. After the house had been "dried in" the Dunsons began making certain improvements to the house over and above that which was required in the plans and specifications. The Dunsons expended approximately $8,000.00 of their own funds in making the fixed improvements to the property which they desired.
On March 24, 1975, Stockton wrote Char Pal a letter advising Char Pal that Stockton had advanced approximately $12,000.00 more to Char Pal than Char Pal would receive from the Dunsons through the sale of the house for $48,150.00. The purpose of the letter was to advise Char Pal that Stockton would require full payment of the sums borrowed by Char Pal at closing. A copy of the letter was forwarded to Mr. Dunson. On May 3, 1975, the Dunsons moved into the house, ostensibly to protect it from vandalism. The house was not completely furnished and, according to Mr. Sid Gervin, it would take from $800.00 to $2,000.00 to complete construction. The Dunsons offered to pay Stockton the amount owed to Char Pal under the contract, $48,150.00, but Stockton refused the offer.
On August 19, 1975, Stockton initiated foreclosure proceedings against the property. The court dismissed the Dunsons' counterclaim against Stockton for damages and disallowed their claim for credit for improvements made to the property. In its order, the court stated that the affirmative defenses and counterclaim had no legal foundation because the Dunsons deeded the property involved to Char Pal for the express purpose of permitting Char Pal to obtain financing for the construction of a dwelling upon the property. The court concluded that the only right the Dunsons had in the litigation was the right of redemption. Later, the court entered a final judgment holding that Stockton's lien on the property by virtue of the mortgage it held from Char Pal was superior to the interests of the Dunsons and that Stockton was entitled to foreclose its mortgage against all named defendants. However, the court forfeited all sums for interest payable to Stockton, holding that Stockton was chargeable with the delays by Char Pal in the completion of the house. The final judgment stated in part:
"(2) That because of its dealings with the property through its agents at the time of and subsequent to the making of said loan the plaintiff is chargeable with the delays by Char Pal, Inc., in the completion of the home upon said property the effect of which, in equity, requires a forfeiture of any sums for interest upon said construction loan and advances and any claim by the plaintiff for rentals for the use and occupancy of said premises by the defendants, Dunson, to this date; ... ."
Thus the court made a specific finding that Stockton was chargeable with the delays by Char Pal, Inc., because of its dealings with the property through its agents.
The Dunsons argue that since Stockton was fully aware of the contract between them and Char Pal prior to Char Pal's execution of the mortgage to Stockton that Stockton's rights as a mortgagee were inferior to those of the Dunsons. They argue: (1) That Char Pal's interest in the property at the time it executed a mortgage to Stockton was no more than a naked legal title held as a security interest which by operation of law was transformed into a personal property right, and as a result Stockton acquired a security interest in Char Pal's interest in the contract only  but did not acquire a lien against the real property. (2) That since Stockton knew the mortgagor, Char Pal, had previously contracted *606 to sell the property, Stockton was then subject to the vendees' right to purchase the property for the amount agreed upon with the mortgagor, and any lien it acquired on the property was inferior to such right to purchase.
The rule is that a purchaser under an executory contract of sale has only an equitable interest in the land, thus a subsequent grantee of the vendor will take free from that interest if he is entitled to protection as a bona fide purchaser. Marion Mortgage Company v. Grennan, 106 Fla. 913, 143 So. 761 (1932). However a person who takes a conveyance but is not entitled to protection as a bona fide purchaser takes subject to the interest of another under an earlier agreement by the vendor to convey. Tate v. Pensacola, Gulf, Land and Development Co., 37 Fla. 439, 20 So. 542 (1896). In such a situation, the subsequent grantee takes the land impressed with the trust in favor of the original vendee.
The Dunsons' argument might have merit had they not conveyed the property by deed to Char Pal. They knew that Char Pal intended to obtain financing for construction of the home from Stockton. Mr. Edgar had informed the Dunsons that he required the deed in order to mortgage the property to Stockton to obtain financing. Moreover, their contract with Char Pal stated that the seller, Char Pal, would pay all costs in connection with interim construction loan financing.
It has long been an established rule of law that "one who assumes to convey an estate by deed is estopped, as against the grantee, to assert anything in derogation of the deed." 12 Fla.Jur. Estoppel and Waiver section 13. Additionally, the fact that the Dunsons may not have had actual knowledge that advances were made by Stockton to Char Pal above the face amount stated in the contract to sell is beside the point. The Dunsons knew that a mortgage would be executed between Char Pal and Stockton. Once that mortgage was recorded they were on constructive notice of the contents of the mortgage, including the future advance clause allowing advances up to double the principal amount stated in the mortgage.
The Dunsons' argument as to whether Stockton, because of its actions, should be estopped from claiming its interests were superior to the Dunsons' in the property has more merit. During the latter part of 1973, the relationship between Stockton and Char Pal became more than that of merely mortgagee-mortgagor. Because of the increasing financial difficulties which Char Pal encountered, Mr. Graham of Stockton countersigned all checks written on Char Pal's banking account. Stockton inspected the work and knew that Char Pal was not progressing satisfactorily with the job. In addition, the loan agreement between Stockton and Char Pal called for the dwelling to be completed within 180 days after construction commenced. Construction, however, did not actually commence until January, 1974. As of the date the foreclosure suit was filed by Stockton, August 19, 1975, the house still was not completed. Nevertheless Stockton encouraged the Dunsons to keep their loan commitment alive with the Veteran's Administration, and in fact on July 16, 1974, Mr. Graham wrote the V.A. advising it the Dunsons wished to do so.
The court was understandably concerned by the delays involved, so much so that its final judgment of foreclosure precluded Stockton from charging any interest on the construction loan and specifically held that Stockton was chargeable with the delays caused by Char Pal. After Mr. Edgar had been placed upon Stockton's payroll, the take-over of Char Pal's operations by Stockton became complete. The separate identities of lending institution and construction company were extinguished and the identities merged into one, as did the identities of mortgagor and mortgagee.
While the Dunsons are estopped by the deed they executed to Char Pal, knowing that Char Pal would execute a mortgage to Stockton as a result of their conveyance, Stockton, once it assumed complete control of Char Pal's operations, also became estopped from disregarding the construction *607 contract entered into between the Dunsons and Char Pal.
After Stockton took over Char Pal's operations, it became subject to the terms of the construction contract to the same extent as Char Pal. And the contract's provisions then became enforceable against Stockton. The contract under these circumstances may be considered an equitable mortgage. There are a number of situations in which instruments which are not effective at law are regarded as such at equity and are as binding on the parties as if mortgages in due form had been properly executed. 22 Fla.Jur. Mortgages section 11.
In Atlantic Federal Savings & L. Ass'n v. Kitimat Corp., 143 So.2d 719 (Fla.2nd DCA 1962), Mr. and Mrs. Elmer Green and Kitimat Corporation entered into an agreement to purchase in which it was provided that the Greens would reserve unto themselves possession of their residence until Kitimat, the seller, delivered an apartment ready for occupancy by the Greens. It was understood by the parties that the value of the Greens' home was $59,000.00. The Greens, simultaneously with the execution of the agreement, conveyed by warranty deed and bill of sale the real estate and certain personal property to Kitimat. At the same time Kitimat gave a mortgage on the real estate it had obtained from the Greens to Atlantic Federal Savings and Loan Association in the amount of $33,000.00. The attorney who represented Kitimat in the Green transaction also represented Atlantic. Kitimat defaulted on its mortgage to Atlantic and a foreclosure suit followed. The trial court in its final decree of foreclosure held that the equities were with the Greens and that the Greens had a valid and existing equitable mortgage lien in the amount of $59,000.00 against the property. In affirming, the Second District Court of Appeal stated that the Greens' interest in the property was that of an equitable lien. The court then quoted the following from Phelps v. Higgins, 120 So.2d 633, 635 (Fla.2nd DCA 1960):
"`Equitable liens may arise, by operation of law from the conduct of the parties, from a variety of transactions to which equity will cause them to attach.'" Id. at 722.
Compare Lawrence v. Cameron Savings and Loan Association, 395 S.W.2d 452 (Mo. 1965), in which the court held that a constructive trust would be imposed in favor of the property holders, the Lawrences, who conveyed by deed 20 acres to a contractor with the oral understanding that the contractor, one Benson, would develop the property into a subdivision, construct houses thereon and obtain financing from the loan association. It was also agreed that the contractor would reconvey any unsold lots to the Lawrences. The loan association's secretary-treasurer was aware of the terms of the oral agreement prior to advancing a loan to Benson, who in turn gave the association a note and a deed of trust on all lots in the subdivision as security for the note. Later, the contractor defaulted on the payments due and the deed of trust was foreclosed.
On appeal the Missouri Supreme Court affirmed the judgment of the lower court which held that a constructive trust would be imposed against the association in favor of the Lawrences. In answer to the association's argument that the trial court's judgment, finding that the Lawrences were the owners of nine lots which were not built upon, was contrary to the evidence since the property was conveyed to the contractor by warranty deed vesting in him a fee simple title without exceptions or reservations, the court replied:
"Under the facts in evidence, however, the deed conveyed only the bare legal title and the Bensons, and upon foreclosure the association, took the title subject to the equitable right of the grantors to be reinvested with the title upon the contingency agreed upon. Equity will impose a constructive trust in the unsold lots in favor of the original grantors who have been deprived of their property by the acts of the foreclosing mortgagee which, with full knowledge of all the surrounding facts and circumstances, wrongfully repudiated the arrangement *608 and has sought to retain the property for its own use and benefit." 395 S.W.2d at 459.
A significant California Supreme Court opinion held liable a savings and loan association, which had exercised extensive control over a home construction enterprise, to a purchaser of one of the homes constructed for consequences resulting from construction defects. In Connor v. Great Western Savings and Loan Ass'n, 69 Cal.2d 850, 73 Cal. Rptr. 369, 447 P.2d 609, 39 A.L.R.3d 224 (1968), the defendant savings and loan association was deeply involved in the development of a residential housing tract along with the contractor, Conejo Valley Development Company. The loan association had agreed to supply the funds necessary to enable the developer to purchase the land in return for the association's right to make construction loans on the homes to be built and the right of first refusal to make long-term loans to the buyers of the homes.
The court rejected the buyers' contention that the loan association and the developers comprised a joint venture, stating that there was no evidence of an agreement between the parties relating to a community of interest in a common business undertaking and an understanding as to the sharing of profits and losses and a right of joint control. Nevertheless, the court held that the association owed a duty to the home buyers in the development even though it was not in privity of contract with any of the buyers except as a lender. The court's opinion holding the association subject to liability was based in great part to the extent of control which the association exercised over the developer. Observe the following:
"Even though Great Western is not vicariously liable as a joint venturer for the negligence of Conejo, there remains the question of its liability for its own negligence. Great Western voluntarily undertook business relationships with South Gate [another developer] and Conejo to develop the Weathersfield tract and to develop a market for the tract houses in which prospective buyers would be directed to Great Western for their financing. In undertaking these relationships, Great Western became much more than a lender content to lend money at interest on the security of real property. It became an active participant in a home construction enterprise. It had the right to exercise extensive control of the enterprise. Its financing, which made the enterprise possible, took on ramifications beyond the domain of the usual money lender. It received not only interest on its construction loans, but also substantial fees for making them, a 20 percent capital gain for `warehousing' the land, and protection from loss of profits in the event individual home buyers sought permanent financing elsewhere." 73 Cal. Rptr. at 376, 447 P.2d at 616.
From the record we find that Char Pal's operations were taken over by Stockton after Charles Edgar was placed on Stockton's payroll. This occurred in either November or December, 1974. Any advances made by Stockton after Mr. Edgar became an employee of Stockton were then subject to the terms of the construction contract and the Dunsons could then enforce those terms against Stockton as effectively as they could against Char Pal. The contract at that point became an equitable lien to which Stockton's mortgage was subordinated. Consequently any advances made by Stockton to Char Pal after Stockton assumed control of Char Pal were also subordinate to the contract.
This cause is remanded to the trial court with directions that it modify its final judgment of foreclosure consistent with the views expressed in this opinion.
RAWLS, Acting C.J., and SMITH, J., concur.